IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

RAY JEFFERSON CROMARTIE,    :
                                    :
           Petitioner,    :
                                      :
      vs.               :     CIVIL ACTION NO. 7:14-CV-39 (MTT)
                                      :
WARDEN, Georgia Diagnostic and    :
Classification Prison,    :
                                      :
          Respondent.    :
_____:

## ORDER

RAY JEFFERSON CROMARTIE was sentenced to death for the murder of

Richard Slysz.   For the reasons discussed below, the Court denies habeas relief.[1]

## I.   BACKGROUND AND PROCEDURAL HISTORY

### A.   Facts

The Georgia Supreme Court summarized the facts of this case in Cromartie's

direct appeal:

> Cromartie borrowed a .25 caliber pistol from his cousin Gary Young on April
> 7, 1994.   At about 10:15 p.m. on April 7, Cromartie entered the Madison
> Street Deli in Thomasville and shot the clerk, Dan Wilson, in the face.
> Cromartie left after unsuccessfully trying to open the cash register.   The
> tape from the store video camera, while too indistinct to conclusively identify
> Cromartie, captured a man fitting Cromartie's general description enter the
> store and walk behind the counter toward the area where the clerk was
> washing pans.   There is the sound of a shot and the man leaves after trying
> to open the cash register.   Wilson survived despite a severed carotid

---

[1] The Court instructed Cromartie to brief all outstanding issues that he wished to pursue, and this Order addresses only those claims that he argued in his briefs.   Any claim not briefed is deemed abandoned. *Blankenship v. Terry*, 2007 WL 4404972, at *40 (S.D. Ga. 2007) (stating that claims not briefed are abandoned because "mere recitation in a petition, unaccompanied by argument, in effect forces a judge to research and thus develop supporting arguments—hence, *litigate*—on a petitioner's behalf") (citations omitted).   To the extent he has not abandoned any unaddressed claims, he certainly has failed to show that the state courts' denials of those claims were contrary to clearly established federal law, involved any unreasonable applications of clearly established federal law, or were based on any unreasonable factual determinations.

artery.   The following day, Cromartie asked Gary Young and Carnell Cooksey if they saw the news.   He told Young that he shot the clerk at the Madison Street Deli while he was in the back washing dishes.   Cromartie also asked Cooksey if he was "down with the 187," which Cooksey testified meant robbery. Cromartie stated that there was a Junior Food Store with "one clerk in the store and they didn't have no camera."

In the early morning hours of April 10, 1994, Cromartie and Corey Clark asked Thaddeus Lucas if he would drive them to the store so they could steal beer.   As they were driving, Cromartie directed Lucas to bypass the closest open store and drive to the Junior Food Store.   He told Lucas to park on a nearby street and wait.   When Cromartie and Clark entered the store, Cromartie shot clerk Richard Slysz twice in the head.   The first shot which entered below Slysz's right eye would not have caused Slysz to immediately lose consciousness before he was hit by Cromartie's second shot directed at Slysz's left temple.   Although Slysz died shortly thereafter, neither wound caused an immediate death.   Cromartie and Clark then tried to open the cash register but were unsuccessful.   Cromartie instead grabbed two 12–packs of Budweiser beer and the men fled.   A convenience store clerk across the street heard the shots and observed two men fitting the general description of Cromartie and Clark run from the store; Cromartie was carrying the beer.   While the men were fleeing one of the 12–packs broke open and spilled beer cans onto the ground.   A passing motorist saw the two men run from the store and appear to drop something.

Cooksey testified that when Cromartie and his accomplices returned to the Cherokee Apartments they had a muddy case of Budweiser beer and Cromartie boasted about shooting the clerk twice.   Plaster casts of shoe prints in the muddy field next to the spilled cans of beer were similar to the shoes Cromartie was wearing when he was arrested three days later. Cromartie's left thumb print was found on a torn piece of Budweiser 12–pack carton near the shoe prints.   The police recovered the .25 caliber pistol that Cromartie had borrowed from Gary Young, and a firearms expert determined that this gun fired the bullets that wounded Wilson and killed Slysz.   Cromartie's accomplices, Lucas and Clark, testified for the State at Cromartie's trial.

*Cromartie v. State*, 270 Ga. 780, 781-82, 514 S.E.2d 205, 209-10 (1999).

## B.   Procedural history

On September 26, 1997, a jury found Cromartie guilty of malice murder, armed

robbery, aggravated battery, aggravated assault, and four counts of possession of a

firearm during the commission of a crime.   *Id.* at 781 n.1, 514 S.E.2d at 209 n.1.   On October 1, 1997, the jury sentenced Cromartie to death for the murder.   *Id.*

Cromartie filed a motion for new trial, and a hearing was held on March 12, 1998. (Doc. 18-24).[2]   On April 7, 1998, the Court denied the motion.   (Doc. 17-8 at 187). Cromartie filed a notice of appeal on May 6, 1998.   (Doc. 18-25 at 1-2).   The Georgia Supreme Court affirmed his conviction and sentence on April 2, 1999.   *Cromartie*, 270 Ga. at 781, 514 S.E.2d at 209.   The United States Supreme Court denied his petition for certiorari on November 1, 1999.   *Cromartie v. Georgia*, 528 U.S. 974 (1999).

Cromartie filed a Petition for Writ of Habeas Corpus in the Superior Court of Butts County, Georgia on May 9, 2000.   (Doc. 19-14).   After conducting an evidentiary hearing, the state habeas court denied relief in an order dated February 8, 2012.   (Docs. 21-14 to 23-20; 23-37).   Cromartie applied for an extension of time to file his Application for Certificate of Probable Cause to Appeal ("CPC application"), which was granted on March 2, 2012.   (Docs. 23-38; 23-39).   Around this time, a key prosecution witness, Gary Young, said he testified falsely at Cromartie's trial.   (Doc. 1 at 8).   On March 8, 2012, Cromartie filed an emergency motion in the Georgia Supreme Court requesting an extension of time to file his notice of appeal.   (Doc. 23-40).   On March 9, 2012, the Georgia Supreme Court granted a 30-day extension.   (Doc. 23-41).

Cromartie filed an emergency motion for reconsideration in the Butts County Superior Court and additional proceedings related to Young's recantation took place in that court.   (Doc. 1 at 9).   Because his emergency motion for reconsideration did not toll

---

[2]  Because all documents have been electronically filed, this Order cites to the record by using the document number and electronic screen page number shown at the top of each page by the Court's CM/ECF software.

the time for filing a notice of appeal, Cromartie filed a notice of appeal on April 9, 2012.
(Docs. 1 at 8; 24-2).   In an order dated April 25, 2012, the Butts County Superior Court
denied Cromartie's emergency motion for reconsideration.   (Doc. 24-3).   On October 1,
2012, the Georgia Supreme Court found that the superior court did not have jurisdiction
when it entered the April 25, 2012 order because Cromartie had previously filed his notice
of appeal on April 9, 2012.   (Doc. 24-8).   The Georgia Supreme Court, therefore,
granted Cromartie's CPC application and remanded his case "to the habeas court to
allow it to regain jurisdiction and . . . enter an appropriate new order."   (Doc. 24-8).   In an
order dated October 5, 2012, the Butts County Superior Court re-entered its April 25,
2012 order denying reconsideration.   (Doc. 24-9).

Cromartie filed a notice of appeal on October 24, 2012 and a CPC application on
November 8, 2012.   (Docs. 24-10; 24-11 at 64).   The Georgia Supreme Court
summarily denied his CPC application on September 9, 2013 and issued its remittitur on
December 10, 2013.   (Docs. 24-14; 33-1).   The United States Supreme Court denied
Cromartie's petition for writ of certiorari on April 21, 2014.   *Cromartie v. Chatman*, 134 S.
Ct. 1879 (2014).

Cromartie filed his habeas petition in this Court on March 20, 2014.   (Doc. 1).   On
April 1, 2014, Respondent filed a motion to dismiss Cromartie's federal habeas petition as
untimely.   (Doc. 9).   Respondent alleged Cromartie's federal habeas petition was
untimely because statutory tolling under 28 U.S.C. § 2244(d)(2) ended on the date the
Georgia Supreme Court denied Cromartie's CPC application.   (Doc. 9 at 4).   On
December 29, 2014, this Court denied Respondent's motion to dismiss, finding that
"Cromartie's federal habeas petition is untimely only if § 2244(d)(2) tolling ended on the

day the Georgia Supreme Court denied Cromartie's CPC application.   It did not."[3]   (Doc. 42 at 18).   After this Court denied Respondent's motion to certify its December 29, 2014 Order for interlocutory appeal, Respondent moved for permission to appeal in the Eleventh Circuit, which was denied on April 10, 2015.   (Docs. 45; 46; 51; 52)

Cromartie, now represented by the Federal Community Defender Office for the Eastern District of Pennsylvania,[4] filed an amended federal habeas petition on June 22, 2015 and Respondent filed an answer on July 22, 2015.   (Docs. 62; 64).   On March, 21, 2016, Respondent moved to amend his answer to assert a statute of limitations defense to Claim Ten in Cromartie's amended petition.   (Doc. 74).   After allowing both parties to brief the issue, the Court granted Respondent's motion to amend.[5]   (Docs. 76 to 80).

Both parties have now briefed all outstanding issues.

---

[3] Since that ruling, the Eleventh Circuit has held that a state habeas petition is "pending," so as to toll the federal one-year statute of limitations, until the Georgia Supreme Court issues the remittitur for the denial of a petitioner's CPC application.   *Dolphy v. Warden, Cent. State Prison*, 823 F.3d 1342, 1345 (11th Cir. 2016).   Thus Cromartie's statute of limitations was tolled until December 10, 2013 and his federal habeas petition was timely filed.

[4] On March 24, 2014, the Court appointed Brian Kammer with the Georgia Resource Center to represent Cromartie.   (Docs. 3; 6).   Because Kammer's conduct might have been at issue in relation to Respondent's motion to dismiss, the Court allowed Kammer to withdraw and, on April 14, 2014, appointed Martin McClain.   (Docs. 8; 11; 13).   Citing his own conflict of interest, McClain moved for substitution of conflict-free counsel on September 16, 2014.   (Doc. 31).   On October 9, 2014, the Court granted his motion and replaced McClain with the Federal Community Defender Office for the Eastern District of Pennsylvania.   (Doc. 36).

[5] Since that ruling, Respondent has not actually filed an amendment to his answer.   The Court sees no need to require him to file an amended answer.   *See* Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts (stating that no answer required "unless judge so orders").   In his motion to amend (Doc. 74), Respondent requested to make only one amendment to his July 22, 2015 answer (Doc. 64).   He sought to assert a statute of limitations defense to Claim Ten in Cromartie's amended habeas petition.   (Doc. 74 at 2).   Before granting Respondent's motion to amend, the Court allowed both parties to fully brief this issue.   (Docs. 76 to 79).   Because Cromartie was given the opportunity to address this issue before the Court granted Respondent's motion to amend, he is not prejudiced by the Court's decision that an actual amended answer is unnecessary.

## II.   STANDARD OF REVIEW

### A.   Exhaustion and procedural default

Procedural default bars federal habeas review when a habeas petitioner has failed to exhaust state remedies that are no longer available or when the state court rejects the habeas petitioner's claim on independent state procedural grounds.   *See Michigan v. Long,* 463 U.S. 1032, 1040-42 (1983) (explaining that an adequate and independent finding of procedural default will generally bar review of the federal claim); *Frazier v. Bouchard,* 661 F.3d 519, 524 n.7 (11th Cir. 2011); *Ward v. Hall,* 592 F.3d 1144, 1156-57 (11th Cir. 2010).

There are two exceptions to procedural default.   If the habeas respondent establishes that a default has occurred, the petitioner bears the burden of establishing "cause for the failure to properly present the claim and actual prejudice, or that the failure to consider the claim would result in a fundamental miscarriage of justice."   *Conner v. Hall*, 645 F.3d 1277, 1287 (11th Cir. 2011) (citing *Wainwright v. Sykes*, 433 U.S. 72, 81-88 (1977); *Marek v. Singletary*, 62 F.3d 1295, 1301-02 (11th Cir. 1995)).   A petitioner establishes cause by demonstrating that some objective factor external to the defense impeded his efforts to raise the claim properly in the state courts.   *Spencer v. Sec'y, Dep't of Corr.*, 609 F.3d 1170, 1180 (11th Cir. 2010) (quoting *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003)).   A petitioner establishes prejudice by showing that there is "a reasonable probability that the result of the proceeding[s] would have been different."   *Id.*   Regarding what is necessary to establish the narrowly-drawn fundamental miscarriage of justice exception, the Eleventh Circuit has stated:

> To excuse a default of a guilt-phase claim under [the fundamental miscarriage of justice] standard, a petitioner must prove "a constitutional

violation [that] has probably resulted in the conviction of one who is actually innocent."   To gain review of a sentencing-phase claim based on [a fundamental miscarriage of justice], a petitioner must show that "but for constitutional error at his sentencing hearing, no reasonable juror could have found him eligible for the death penalty under [state] law."

*Hill v. Jones*, 81 F.3d 1015, 1023 (11th Cir. 1996) (citations omitted).

## B.   Claims that were adjudicated on the merits in the state courts

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides the standard of review.   This Court may not grant habeas relief with respect to any claim that was adjudicated on the merits in state court unless the state court's decision was (1) contrary to clearly established Federal law; (2) "involved an unreasonable application of clearly established Federal law;" or (3) "was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding."   28 U.S.C. § 2254(d)(1)-(2); *see also Harrington v. Richter*, 562 U.S. 86, 100 (2011).   The phrase "clearly established Federal law" refers to the holdings of the United States Supreme Court that were in existence at the time of the relevant state court decision.   *Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"The 'contrary to' and 'unreasonable application' clauses of § 2254(d)(1) are separate bases for reviewing a state court's decisions."   *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001) (citing *Williams*, 529 U.S. at 404-05).

Under § 2254(d)(1), "[a] state court's decision is 'contrary to'... clearly established law if it 'applies a rule that contradicts the governing law set forth in [the United States Supreme Court's] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the United States Supreme] Court and nevertheless arrives at a [different] result. . . .'"

*Michael v. Crosby,* 430 F.3d 1310, 1319 (11th Cir. 2005) (quoting *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003)).

A state court's decision involves an "unreasonable application" of federal law when "'the state court identifies the correct governing legal rule but unreasonably applies it to the facts of the particular state prisoner's case, or when it unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context.'" *Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1286 (11th Cir. 2012) (quoting *Greene v. Upton*, 644 F.3d 1145, 1154 (11th Cir. 2011)). An "unreasonable application" and an "incorrect application" are not the same:

> We have explained that an *unreasonable* application of federal law is different from an *incorrect* application of federal law. Indeed, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable. This distinction creates a substantially higher threshold for obtaining relief than *de novo* review. AEDPA thus imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt.

*Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations and quotation marks omitted). To obtain relief "a state prisoner must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. In other words, a habeas petitioner must establish that no fairminded jurist could agree with the state court's decisions. *Woods v. Etherton*, 136 S. Ct. 1149, 1152-53 (2016); *Pope v. Sec'y, Fla. Dep't of Corr.*, 752 F.3d 1254, 1262 (11th Cir. 2014); *Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1257 (11th Cir. 2012).

Pursuant to 28 U.S.C. § 2254(d)(2), district courts can "grant habeas relief to a petitioner challenging a state court's factual findings only in those cases where the state court's decision 'was based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding.'"   *Price v. Allen*, 679 F.3d 1315, 1320 (11th Cir. 2012) (quoting 28 U.S.C. § 2254(d)(2)).   A state court's factual finding is not unreasonable simply because the federal habeas court might have made a different finding had it been the first court to interpret the record.   *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013) (citing *Wood v. Allen*, 558 U.S. 290, 301 (2010)).   Again, this Court can grant relief only if it finds "no 'fairminded jurist' could agree with the state court's determination" of the facts.   *Holsey*, 694 F.3d at 1257 (quoting *Richter*, 562 U.S. at 101).   Also, a state court's factual determination is "presumed to be correct," and this presumption can only be rebutted by "clear and convincing evidence."   28 U.S.C. § 2254(e)(1).

## C.   The relevant state court decisions

When deciding if the state court's decision was contrary to Supreme Court precedent, or involved an unreasonable application of law or determination of fact, the court "review[s] one decision: 'the last state-court adjudication on the merits.'"   *Wilson v. Warden*, 834 F.3d 1227, 1232 (11th Cir. 2016) (quoting *Greene v. Fisher*, 565 U.S. 34, 40 (2011)), *cert. granted*, 85 U.S.L.W. 3409 ( Feb. 27, 2017) (No. 16-6855).   The relevant decision in Cromartie's case for claims that were adjudicated on direct appeal is the Georgia Supreme Court's opinion.   *Cromartie*, 270 Ga. at 780-89, 514 S.E.2d at 209-15. For claims that the Georgia Supreme Court "provide[d] a reasoned opinion," this Court "evaluate[s] the opinion."   *Wilson*, 834 F.3d at 1235.   The relevant decision for claims adjudicated during state habeas proceedings is the Georgia Supreme Court's summary denial of Cromartie's CPC application.   *Id.* at 1232-35.   Because the Georgia Supreme Court "provide[d] no reasoned opinion" this Court "review[s] that decision using the test announced in *Richter*":

> [A] petitioner's burden under section 2254(d) is to "show[] there was no reasonable basis for the state court to deny relief."   "[A] habeas court must determine what arguments or theories . . . could have supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the United States Supreme] Court." Under that test, [Cromartie] must establish that there was no reasonable basis for the Georgia Supreme Court to deny his [CPC application].

*Id.* at 1235 (quoting *Richter*, 562 U.S. at 98, 102).

The state habeas court's final orders denying state habeas relief (Doc. 23-37; 24-9) are relevant in two respects.[6]   First, if the state habeas court denied a claim on a procedural ground, such as procedural default, the Court assumes the Georgia Supreme Court's denial of relief "rests on the same *general* ground."   *Id.* at 1236.   Thus, there is a "rebuttable presumption that state procedural default rulings are not undone by" the Georgia Supreme Court's unexplained denial of a CPC application.   *Id.* at 1237. Second, "[w]hen assessing under *Richter* whether there 'was no reasonable basis for the state court to deny relief,' a federal habeas court may look to a previous opinion as one example of a reasonable application of law or determination of fact."   *Id.* at 1239 (quoting *Richter*, 562 U.S. at 98).   If the reasoning of the state habeas court is reasonable, the federal court's inquiry ends because "there is necessarily at least one reasonable basis on which the [Georgia Supreme Court] could have denied relief."   *Id.*   The relevant state

---

[6]  Cromartie argues this Court should exercise *de novo* review of the claims decided by the state habeas court because that court's February 8, 2012 order denying relief (Doc. 23-37) was a nearly verbatim adoption of a proposed order written by Respondent's counsel (Doc. 69 at 24).   This argument fails for two reasons.   First, the Georgia Supreme Court's denial of Cromartie's CPC application is the relevant state court decision, not the state habeas court's orders.   (Docs. 23-37; 24-9).   Second, even if the state habeas court's orders were the relevant decisions, this Court would still have to apply AEDPA deference. *Andersen v. Bessemer City*, 470 U.S. 564, 572 (1985) (finding that "even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous"); *Tharpe v. Warden*, 834 F.3d 1323, 1334 (11th Cir. 2016) (affirming the district court's rejection of petitioner's argument that the state habeas court "had almost verbatim, and thus improperly, relied on the State's proposed order in issuing its own order") (citations omitted); *Jones v. GDCP Warden*, 753 F.3d 1171, 1182 (11th Cir. 2014) (finding AEDPA deference still applies even when the state habeas court adopted verbatim the respondent's proposed order) (citations omitted); *Rhode v. Hall*, 582 F.3d 1273, 1281-82 (11th Cir. 2009) (same).

court decision, however, is still the Georgia Supreme Court's denial of the CPC application "and federal courts are not limited to assessing the reasoning of the lower court."   *Id.*   Thus, if the state habeas court's opinion "contains flawed reasoning," federal courts must give the Georgia Supreme Court "'the benefit of the doubt,' and presume that it 'follow[ed] the law.'"[7]   *Id.* at 1238 (citations omitted).

### III.   CROMARTIE'S CLAIMS

#### A.   Claim One: The trial court's failure to dismiss jurors for cause

Cromartie argues that the trial court violated the Sixth and Fourteenth Amendments when it failed to excuse for cause, on defense motion, five potential jurors whose statements made it "abundantly clear that, if they found the killing to be intentional, they would vote for death": Kenneth Barwick, Herman Burleson, Charles Bruce, Gary Pitts, and Harlan Rogers, Jr..   (Doc. 69 at 51).   He also argues that the trial court erred when it refused to excuse for cause, on defense motion, two additional potential jurors with a pro-prosecution bias: Martha May and Phyllis Jones.   (Doc. 69 at 53-54).

Respondent argues that Cromartie's challenges to Pitts and Rogers are unexhausted.   (Doc. 75 at 42).   On direct appeal, Cromartie argued that "[t]he trial court erroneously failed to excuse a number of prospective jurors whose voir dire responses demonstrated that they could not be fair and impartial in this case . . . ."   (Doc. 18-26 at 109).   He stated that prospective jurors Burleson, Bruce, Simmons, Barwick, Harden,

---

[7] *Wilson* is the "law of the circuit unless and until the Supreme Court overrules it."   *Butts v. GDCP Warden*, 2017 W.L. 929749, at *2 n.2 (11th Cir. 2017).   But, "[t]o simplify matters, and prevent them from being contingent on the Supreme Court's decision in *Wilson*," the Court has "made the § 2254 determination based on the state trial court's explanation for its rejection of [Cromartie's] claim[s]."   *Id.*   Doing so, the Court has determined that the state trial court reasonably denied relief.   There was, therefore, "at least one reasonable basis on which the [Georgia Supreme Court] could have denied relief.   *Wilson*, 834 F3d at 1239.

and Kornegay[8] indicated "they could not fairly consider a sentence less than death or mitigating evidence" and, therefore, the trial court's failure to excuse them violated his right to an impartial jury.   (Doc. 18-26 at 114).   Cromartie acknowledges he failed to argue in his appellate brief that Pitts and Rogers should have been excused.[9]   He argues, instead, that his general claim regarding the trial court's failure to excuse potential jurors is "exhausted and the voir dire of jurors Rogers . . . and Pitts was part of the record considered by the state courts in adjudicating this claim."   (Doc. 69 at 52 n.5).

To exhaust, Cromartie had to make the Georgia Supreme Court aware of both the legal and factual bases for his claims.   *See Kelley v. Sec'y, Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004) (finding that "the prohibition against raising nonexhausted claims in federal court extends not only to broad legal theories of relief, but also to the specific assertions of fact that might support relief").   Cromartie's assertions about Pitts and Rogers are "specific assertions of fact" he never made before the Georgia Supreme Court.   *Id.*   Cromartie did not exhaust these factually specific allegations by arguing generally that the trial court erred for failing to excuse biased jurors.   *See id.* (finding that a general claim of ineffective assistance of counsel presented to the state courts does not exhaust specific instances of ineffective assistance not presented to the state courts).   Nor did Cromartie exhaust his allegations related to Pitts and Rogers simply because their voir dire "was part of the record considered by the state courts in adjudicating" his general claim that the trial court erroneously failed to excuse jurors.   (Doc. 69 at 52 n.5).   "[T]o preserve a claim . . .   for federal review, the habeas petitioner must assert his theory

---

[8]  In these proceedings, Cromartie makes no allegations regarding Simmons, Harden and Kornegay.

[9]  In a different section of his appellate brief, Cromartie did argue that the trial court erroneously restricted trial counsel's questioning of Rogers.   (Doc. 18-26 at 118).   Cromartie does not argue that this exhausted his claim that Rogers should have been excused for cause due to his views on the death penalty.

of relief and transparently present the state courts" with the facts that support relief.
*Kelley*, 377 F.3d 1317 at 1344.   Cromartie failed to "transparently present" the Georgia
Supreme Court with any facts about Pitts and Rogers to support his failure-to-excuse
claim.   *Id.*

Cromartie's reliance on *Miller-El v. Dretke*, 545 U.S. 231 (2005) is misplaced.   In
that case, no one disputed that Miller-El had fairly presented his *Batson* claim to the state
court.   *Id.* at 241 n.2.   The dissent questioned whether the evidence Miller-El relied on in
the federal courts had been presented to the state courts.   *Id.* at 279 (Thomas, J.,
dissenting).   The majority stated that the evidence on which it "base[d] [its] result, was
before the state courts" and nothing in AEDPA prevented Miller-El from presenting a
different theory based on that evidence.   *Id.* at 241 n.2 (citations omitted).

In Cromartie's case, the Respondent does dispute whether Cromartie fairly
presented his failure-to-excuse claims for Pitts and Rogers to the state court.   When
Cromartie argues that Pitts and Rogers should have been excused for cause, he is not
presenting a different theory or argument based on evidence he presented to the Georgia
Supreme Court.   He is presenting a new challenge to two jurors who he never mentioned
when his case was pending before the Georgia Supreme Court.   Just as "habeas
petitioners may not present particular factual instances of ineffective assistance of
counsel in their federal petitions that were not first presented to the state courts,"
Cromartie cannot present "particular factual instances" of the trial court's failure to excuse
for cause allegedly pro-death penalty jurors that were not first presented to the state
court.   *Kelley*, 377 F.3d at 1344 (quoting *Footman v. Singletary*, 978 F.2d 1207, 1211
(11th Cir. 1992)).

But, even assuming Cromartie fully exhausted all of his failure-to-excuse claims, he is not entitled to habeas relief because none of the potential jurors about which Cromartie complains served on his jury.   (Docs. 18-11 at 43-51; 75 at 36).   Twelve jurors were empaneled before potential jurors May and Jones were called and trial counsel[10] used peremptory strikes to excuse Barwick, Burleson, Bruce, Pitts, and Rogers.   (Doc. 18-11 at 42-51).   Trial counsel did not have to use all of their peremptory strikes,[11] and none of the jurors who sat on Cromartie's jury had been challenged for cause by trial counsel.   (Docs. 18-1 at 205; 18-2 at 110, 141; 18-3 at 16, 61, 160-61; 18-4 at 62; 18-6 at 82, 98,140-41, 155; 18-7 at 10, 64, 91, 127, 164-66; 18-11 at 11, 36-51, 100).   Under *United States v. Martinez-Salazar*, if a trial court errs in failing to exclude a juror for cause and "the defendant elects to cure such an error by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any rule-based or constitutional right."   528 U.S. 304, 307 (2000). Therefore, even if the trial court erred in failing to remove the jurors about which Cromartie complains, he was not deprived of any "constitutional right" and this claim must be denied.   *Id*.

Cromartie argues that *Martinez-Salazar* was wrongly decided and, regardless, the Georgia Supreme Court's decision was still contrary to clearly established federal law announced in *Witherspoon v. Illinois*, 391 U.S. 510 (1968), *Wainwright v. Witt*, 469 U.S. 412 (1985), and their progeny. (Doc. 78 at 40).   The Court disagrees.   28 U.S.C. §

---

[10]  At trial, Cromartie was represented by Michael Mears and Gerard Kleinrock, both with the Multicounty Public Defender's Office, and Thomasville attorney Carl Bryant.   (Docs. 17-1 at 46; 17-4 at 41-42; 18-1).

[11]  When Cromartie was tried in 1997, he was allowed twenty strikes during the selection of twelve jurors and eight strikes during the selection of four alternate jurors.   O.C.G.A. § 15-12-165 (1981) (amended by Laws 2005, Act 8, § 7, eff. July 1, 2005); O.C.G.A. § 15-12-169 (1981) (repealed by Laws 2011, Act 50 § 1-6, eff. July 1, 2012).

2254(a) provides that a federal "court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."   Under *Martinez-Salazar*, there was no constitutional violation because none of the jurors about which Cromartie complains were empaneled.   Therefore, even if the Court found, under § 2254(d), that the Georgia Supreme Court's decision was contrary to, or an unreasonable application of, *Witherspoon* or *Witt*,[12] it could not grant habeas relief because there was no violation of the federal Constitution, laws, or treaties.

**B.    Claim Two: The trial court's dismissal of Juror Kelly Smith for cause**

Cromartie claims that Juror Kelly Smith should not have been excused for cause. (Doc. 69 at 58-62).   The record shows that the trial court asked Smith if she was conscientiously opposed to capital punishment and she answered, "No."   (Doc 18-3 at 129).   The court questioned if she would automatically vote to impose the death penalty regardless of the evidence and the instructions given.   (Doc. 18-3 at 130).   Again, she answered, "No."   (Doc. 18-3 at 130).

Next, the State examined Smith:

Q.   Are you morally opposed to the imposition of the death penalty under any circumstances?

---

[12] The Court does not make such a finding.   The Georgia Supreme Court cited *Witt* and quoted the correct standard: "[A] prospective juror is not disqualified based upon his views on capital punishment unless the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."   *Cromartie*, 270 Ga. at 784, 514 S.E.2d at 211 (internal quotation marks and citations omitted).   For the jurors who allegedly had pro-prosecution or other biases, the Georgia Supreme Court found they could set aside their opinions and render a verdict based solely on the evidence presented.   *Id.* at 784-85, 514 S.E.2d at 211-12.   Looking at the entire voir dire and affording the appropriate deference to the state courts, the Court cannot find the trial court's failure to excuse these prospective jurors and the Georgia Supreme Court's affirmance of those decisions were contrary to, or an unreasonable application of, clearly established federal law.   *Uttecht v. Brown*, 551 U.S. 1, 6-10 (2007) (discussing the "limited role of federal habeas relief in the area" of juror excusals due to the deference that must be given to a trial court's determinations)

A.   I'm opposed, but, I, I just don't believe in it, in the death penalty.

Q.   The Judge asked you a minute ago were you conscientiously opposed to the death penalty.   Are you conscientiously opposed to the death penalty?

A.   Yes; I am opposed to the death penalty.

Q.   Did you misunderstand the Judge's question a minute ago?

A.   I guess so; yes, sir.

Q   His question was, I think if I may state what I think he said was . . . are you conscientiously opposed to the death penalty?

A.   Yes.

Q.   Okay, is that fixed in your mind?

A.   Yes.

Q.   You could not give someone the death penalty?

A.   No, sir.

Q.   Under any circumstances?

A.   No, sir.

Q.   I believe the Judge – You, you, automatically would not impose the death penalty.

A.   No, sir.

Q   No matter what the evidence or the facts were.

A.   No, sir.

(Doc. 18-3 at 132-33).

The Court intervened, stating it needed to "redo the questions" to make sure Smith

understood:

[T]he question that I have to determine at this time in my mind is whether or not you would listen to the evidence, you would follow the [c]ourt's

instructions in regards to the law concerning consideration of the three possible punishments and, of course, make your determination based on the evidence and the instructions of the law as opposed to a position of at this time in your mind being automatically and, and, as stated, irrevocably, meaning you would not change your mind under any circumstances, automatically and irrevocably opposed to the imposition of the death penalty.   Do you understand what I'm talking about, my question?

A.   I think so.

THE COURT: If you were selected and if this case reached the second phase, at this time, regardless of what the evidence was and regardless of what the instructions of the law were from the [c]ourt, is it my understanding that you could not and would not consider imposition of the death penalty?

A.   Yes, sir.   Correct.

(Doc. 18-3 at 133-34).

Trial counsel then questioned Smith.   She indicated that she would have no problems serving as a juror if the death penalty was not at issue.   (Doc. 18-3 at 135-36). She reiterated that she did not "agree with" the death penalty and attributed her beliefs to her religious training.   (Doc. 18-3 at 136).   Smith affirmed that she "would listen" to all the evidence and instructions:

Q.   And would you listen and follow the instructions of the, of the [c]ourt, . . . before you made your decision about what penalty would be appropriate?

A.   Yes; I would listen.

Q.   Okay.   Now, you would do all of that.   The problem is, would you be able to vote for the death penalty if you thought it was appropriate?

A.   I would have to think about that.   Since I don't agree with the death penalty it would take, you know, I would have to take great consideration in that before I could agree with it or hand that sentence out.

Q.   If you thought it was appropriate though after you considered it, and even though it's something that you personally don't believe in, if you were called to serve would you listen to the evidence—you said you would do that

A.   Um-hum (affirmative).

Q.   And you'd listen to the instructions of the [c]ourt.   You said you would do that?

A.   Um-hum (affirmative).

Q.   Could you, if you thought it was in accordance with the evidence and the instructions of the [c]ourt, an appropriate sentence, could you vote for the death penalty?

A.   I, I don't know.   To be honest, I don't know.

Q.   Okay.   That's a tough question.

A.   It is.

Q.   But at least you would consider the death penalty as part of a sentencing option if you were called upon to do so?

A.   I, I would listen to all of the information I was given.

Q.   And would you do your very best to be fair?

A.   Yes, sir.

Q.   And would you do your very best to make the right decision based upon the evidence and the instructions of the [c]ourt?

A.   Yes, sir.

(Doc. 18-3 at 138-39).

The trial court again questioned Smith:

THE COURT:   Ms. Smith, based on your religious belief, do you feel like it would be difficult for you to lay your personal feelings aside and follow the law in regards to the instructions given you by the [c]ourt?

A.   Do I think it would be difficult?

THE COURT:   Yes, ma'am.

A.   No; not if that was the instructions I was given I don't think it would be. It's what I believe.

THE COURT:   I understand that.

A.   But given the evidence that I would be given I would listen and try to follow the instructions.

THE COURT:   I guess we get back full circle to where we were.   At this time, regardless of the evidence and the [c]ourt's instructions, do you feel that you would be able to vote to impose the death penalty in this particular matter?

A.   I'm sorry.   I, I didn't understand.

THE COURT:   At this time, are you in a position, frame of mind, your views and opinions on capital punishment, the death penalty, are those such at this time that you would automatically vote against the imposition of the death penalty, again regardless of what the evidence showed and what the law was?

A.   At this time?

THE COURT:   Yes, ma'am.

A.   Yes, sir.

(Doc. 18-3 at 140)

The State moved to excuse Smith for cause.   (Doc. 18-3 at 141).   Trial counsel

objected, pointing out that the trial court allowed allegedly pro-death penalty juror Barwick

to remain on the panel.[13]   (Doc. 18-3 at 141).   The trial court explained its decision to

excuse Smith for cause:

Of course, my interpretation of, I believe it's Mr. Kenneth Barwick's answers to the voir dire questions, not only his verbalization but his demeanor, my interpretation of his responses are somewhat different from Ms. Smith's responses.   Ms. Smith may have equivocated a very small amount on one or two, possibly two questions propounded by the Defense.

But, I think taking all of her responses into consideration in the voir dire examination, at this time she'd be unable to apply the law based upon her religious views.   She holds a strong personal aversion to the death penalty and is very uncertain as to whether or not she could actually impose such. And I think she would be unable to apply the law as opposed to following her personal beliefs in this particular matter.

---

[13]  Barwick remained on the panel but, as explained previously, he did not ultimately serve on the jury.

> Therefore, I do find as a fact and determine that she should be and she is excused because of her views on capital punishment.   I feel that her views would prevent, substantially impair her in the performance of her duties as a juror in accordance with the instructions of the [c]ourt and the oath that she would undertake as a juror in this case.

(Doc. 18-3 at 142).

On direct appeal, Cromartie argued Smith should not have been excused for cause, and the Georgia Supreme Court found:

> The trial court did not err by excusing prospective Juror Smith for cause due to her inability to consider a death sentence.   "The proper standard for determining the disqualification of a prospective juror based upon his views on capital punishment 'is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."'"   Although she answered several questions equivocally, Juror Smith also repeatedly and firmly stated that she could not vote to impose a death sentence under any circumstances. The trial court was authorized to excuse her for cause.

*Cromartie*, 270 Ga. at 783, 514 S.E.2d at 210-11 (citations omitted).

Cromartie argues this decision was based on an unreasonable determination of the facts.   (Doc. 69 at 60).   He alleges the Georgia Supreme Court's factual finding that Smith "repeatedly and firmly stated that she could not vote to impose a death sentence under any circumstances" was unreasonable in light of the evidence presented for two reasons.   *Cromartie*, 279 Ga. at 783, 514 S.E.2d at 211.   First, Smith stated she would "give the death penalty great consideration."   (Doc. 69 at 60-61).   According to Cromartie, Smith's anti-capital punishment protestations were no more pronounced than the pro-death penalty position taken by other prospective jurors who the trial court refused to excuse for cause.   (Doc. 69 at 58 n.7).   Second, when Smith said she could not vote for the death penalty "at this time," she merely meant that she could not vote for the death penalty before she heard any evidence, argument, or instruction.   (Doc. 69 at

61).

The question of whether a juror should be disqualified is one of fact to which "the statutory presumption of correctness to the trial court's resolution" applies.   *Patton v. Yount*, 467 U.S. 1025, 1038 (1984).   The fact that Smith's testimony was "ambiguous and at times contradictory" is not unusual.   *Id.* at 1039.   As the Georgia Supreme Court acknowledged, Smith answered equivocally at times, (Doc. 18-3 at 138-40), but she also firmly stated on several occasions that she could not vote for the death penalty.   (Doc. 18-3 at 133-34, 140).   Cromartie complains that the trial court's refusal to excuse the pro-death penalty jurors, while it excused Smith, shows the unfairness of the voir dire as a whole.   (Doc. 69 at 58 n.7).   It doesn't.   The trial court's resolution of who to excuse "is essentially one of credibility, and therefore largely of demeanor."   *Yount*, 467 U.S. at 1038.   In Cromartie's case, the trial court stated that it considered not only the "verbalization," but the "demeanor" of the prospective jurors before concluding if their views would prevent or substantially impair them in the performance of their duties. (Doc. 18-3 at 142).   Such considerations must be given deference, by both the appellate court and this Court.   *Id.*

When Smith affirmed she could not vote for the death penalty "[a]t this time," it is not, as Cromartie argues, clear that she meant she could not vote for the death penalty at that moment because she had not heard the evidence, argument, or instruction.   (Doc. 18-3 at 140).   Another, perhaps more likely interpretation, is that she meant her currently held ("at this time") beliefs and opinions would prevent her from voting for the death penalty regardless of the evidence.   (Doc. 18-3 at 140).   The trial court specifically and repeatedly inquired whether Smith's views and opinions on capital punishment "[a]t this

time" would automatically lead her to vote against the death penalty "regardless of what the evidence showed and what the law was." (Doc. 18-3 at 140). She affirmed that they would. In fact, she affirmed at least twice that "at this time, regardless of what the evidence was and regardless of what the instructions of law were from the court" she "could not and would not consider the imposition of the death penalty." (Doc. 18-3 at 134).

Cromartie also argues the Georgia Supreme Court's decision involved an unreasonable application of *Witt*. The court correctly cited the *Witt* standard—whether a juror's views on capital punishment "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Cromartie*, 270 Ga. at 783, 514 S.E.2d at 210-11 (internal quotation marks and citations omitted). And, the court reasonably applied this standard to Smith, who stated on several occasions that she could not vote for the death penalty, regardless of the evidence and the law. *Id.*; (Doc. 18-3 at 134, 140).

Cromartie has failed to show that no fairminded jurist could agree with the Georgia Supreme Court's factual determinations regarding Smith or its application of *Witt*. There was "fair support in the record for the state courts'" decision regarding Smith. *Yount*, 467 U.S. at 1038. This Court, therefore, denies relief on this claim.

## C. Claim Three: The trial court's refusal to sever the charges

Cromartie argues that his rights to a fair trial and due process were violated when the trial court denied his motion to sever and ordered that the Madison Street Deli and Junior Food Store shootings be tried together. (Doc. 69 at 62-67). Citing circuit court opinions, Cromartie states that "[d]ue process requires severance whenever joinder

would result in a fundamentally unfair trial."   (Doc. 69 at 62).   Respondent argues there is no clearly established Supreme Court precedent that the misjoinder of claims violates due process and, therefore, this claim should be denied on that basis alone.   (Doc. 75 at 96).   In reply, Cromartie states he is not alleging the Georgia Supreme Court's decision was contrary to, or involved an unreasonable application of, federal law.   (Doc. 78 at 43). Instead, he "argues that this Court must review the merits of his claim because the state court denial of the claim was based on an unreasonable determination of the facts pursuant to 28 U.S.C. § 2254(d)(2)."   (Doc. 78 at 43-44).   Specifically, he argues the Georgia Supreme Court unreasonably found the two shootings "'were part of a single scheme or plan to rob convenience[-type] stores.'"   (Doc. 78 at 44) (quoting *Cromartie*, 270 Ga. at 783, 514 S.E.2d at 210).

Cromartie was indicted in a single indictment for both the April 7, 1994 aggravated assault and aggravated battery at the Madison Street Deli and the April 10, 1994 murder and armed robbery at the Junior Food Store.   (Doc. 17-1 at 29-31).   Trial counsel moved to sever the Madison Street Deli charges from the Junior Food Store charges, and the trial court held a hearing to address the motion.   (Docs. 17-2 at 11-12; 17-7 at 252-75; 17-8 at 1-7).

Trial counsel argued that no evidence tied Cromartie to the April 7 Madison Street Deli robbery.   (Docs. 17-7 at 273; 17-8 at 6).   They stated that "there's no connection, there's no pattern, there's no . . . sufficiency of similarity between the offenses to . . . allow them to be tried jointly."   (Doc. 17-8 at 6).   Thomasville Police Department Lieutenant Melvin Johnson testified regarding the similarities between the two: (1) both occurred within days of each other (Doc. 17-7 at 272); (2) both occurred at night (Docs. 17-7 at 272,

274-75; 17-8 at 1); (3) both involved a white male clerk working alone in a convenience store (Docs. 17-7 at 272, 274-75, 17-8 at 1); (4) the same gun was used in both (Docs. 17-7 at 274; 17-8 at 1); (5) in both, the perpetrator attempted, without success, to open the cash register (Doc. 17-7 at 274); (6) no customers were present at either convenience store (Doc. 17-8 at 1); (7) both store clerks were shot in the head (Doc. 17-8 at 1); (8) the shooter engaged in no struggle at either convenience store and said nothing to the clerks before he shot them (Doc. 17-8 at 3); and (9) Madison Street Deli and the Junior Food Store are located within a mile of each other.   (Doc. 17-8 at 3).   The trial court denied the motion to sever.   (Doc. 17-8 at 7).

On appeal, the Georgia Supreme Court found that

> [t]he trial court did not abuse its discretion in denying [Cromartie's] motion to sever the offenses at the Madison Street Deli from the offenses at the Junior Food Store.   In this case, the two shootings were similar, occurred only three days apart, involved the same gun, and were part of a single scheme or plan to rob convenience-type stores.

*Cromartie*, 270 Ga. at 783, 514 S.E.2d at 210 (citations omitted).

Because a fairminded jurist could agree that the robberies "were part of a single scheme or plan to rob convenience-type stores," that factual finding was not unreasonable.   *Id.*   The record is not "devoid of any indication that they were committed in pursuit of some common scheme or that they had some connection." *Harrell v. State*, 297 Ga. 884, 890, 778 S.E.2d 196, 202 (2015).   To the contrary, the facts surrounding the crimes—the same gun, same type of convenience store, proximity of the stores, same attempt to obtain cash from the register, proximity of time, the manner in which both were committed—indicate a single plan to rob convenience stores.

In *United States v. Lane*, the Supreme Court stated that "[i]mproper joinder does not, in itself, violate the Constitution.   Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial."   474 U.S. 438, 446 n.8 (1986).   Even then, "an error involving misjoinder 'affects substantial rights' and requires reversal only if the misjoinder results in actual prejudice because it 'had [a] substantial and injurious effect or influence in determining the jury's verdict.'"   *Id.* at 449 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).   Relying on a case from the Ninth Circuit, Cromartie argues "[b]y trying the two cases together, the [S]tate encouraged the jury to convict Mr. Cromartie of the Madison Street Deli shooting based on the stronger evidence it presented as to the Junior Food Store shooting."   (Doc. 78 at 45) (citing *Bean v. Calderon*, 163 F.3d 1073, 1085 (9th Cir. 1998)).   There is no clearly established federal law holding that disparity of evidence causes misjoinder that renders a trial unfair.   There was sufficient evidence of Cromartie's guilt in both robberies and shootings.   *Cromartie*, 270 Ga. at 782, 514 S.E.2d at 209-10.   Also, the evidence for both was straightforward and it seems unlikely the jury confused which crimes—Madison Street Deli versus Junior Food Store—the particular evidence was introduced to establish.   Thus, even if joinder was improper, Cromartie has not shown it resulted in an unfair trial.   This claim is, therefore, denied.

**D.   Claim Four: Suppression of evidence and ineffective assistance of counsel for failing to uncover and present the suppressed evidence**

      1.   <u>Suppression of statements</u>

"[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).   A *Brady* violation has three components: "[1]

The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).   The prejudice prong is satisfied if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).   The Court must "evaluate the tendency and force of the undisclosed evidence item by item; there is no other way." *Kyles v. Whitley*, 514 U.S. 419, 436 n.10 (1995). Then, the Court must make a determination about the "cumulative effect." *Id.* at 437.

Cromartie argues that the State suppressed material, exculpatory evidence regarding the identity of the perpetrator of the Madison Street Deli shooting.   He states the Thomasville police had in their possession, but failed to turn over to trial counsel, statements from "two disinterested witnesses" who saw Gary Young running from the Madison Street Deli just after Wilson was shot.   (Doc. 69 at 67).   These "disinterested witnesses" were Keith Reddick and his cousin, Terrell Cochran.[14]   (Docs. 21-14 at 145-69; 21-15 at 7-20).

At the state habeas evidentiary hearing, both Reddick and Cochran testified that they told detectives they saw Young running from the area in front of the Madison Street

---

[14]  The Court agrees with Respondent that it is a bit of a stretch to call these two "disinterested."   (Doc. 75 at 107).   On April 12, 2014, Reddick and Alonzo Brown were walking through the projects when they encountered several men.   (Doc. 17-28 at 6, 32).   According to Reddick, there were four men: Gary Young, Corey Clark, Ray Cromartie, and, possibly, Carnell Cooksey.   (Docs. 17-28 at 8, 13-16, 18; 21-14 at 148-49).   According to Brown, there were three men, who he could not identify at the time, but later learned were Young, Clark, and Cooksey.   (Doc. 17-28 at 33-39.).   Both Reddick and Brown testified that Young grabbed Reddick, placed a gun to his head, and robbed him.   (Docs. 17-28 at 13; 21-14 at 148-50).   In the record, this robbery is referred to as the "strong-arm robbery."   (Doc. 21-14 at 72, 114, 123).   While Cochran was not a victim, witness, or in any way connected to the strong-arm robbery, he is Reddick's cousin.   (Doc. 21-14 at 145).   Thus, Reddick and Cochran, had, as found by the state habeas court, "clear motives to be biased against Mr. Young."   (Doc. 23-37 at 51).

Deli on April 7, 1994.   (Docs. 20-47 at 30-33; 21-14 at 147; 21-15 at 11-12, 14; 21-31 at 9-10, 15-16).   Both claimed that had trial counsel asked, they would have told them what they saw that night.   (Docs. 20-47 at 31, 33; 21-31 at 10).   The state habeas court found this claim was procedurally defaulted and Cromartie failed to prove cause and prejudice or a fundamental miscarriage of justice to overcome the default.   (Doc. 23-37 at 18-50).   Alternatively, the state habeas court found Cromartie's *Brady* claim was meritless.   (Doc. 23-37 at 50-54).   This Court looks at both determinations.[15]

The state habeas court found Cromartie failed to show cause to overcome procedural default or suppression to establish the second element of his *Brady* claim because he failed to prove Cochran and Reddick told anyone they saw Young running from the Madison Street Deli.   (Doc. 23-37 at 21-23, 32-36, 51-52).   Thus, he failed to "first establish that there was something for the State to suppress."   *Bishop v. Warden*, *GDCP*, 726 F.3d 1243, 1258 (11th Cir. 2013).   Also, trial counsel were aware that detectives interviewed Cochran and Reddick and trial counsel had access to both of these witnesses.   (Doc. 23-37 at 19, 52-53).   Thus, there could be no State

---

[15] Normally, when a state court rules in the alternative, finding both a procedural default and addressing the merits of a claim, as the state habeas court did with Cromartie's *Brady* claims, this Court should apply the procedural bar and decline to reach the merits of the claim.   *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Richardson v. Thigpen*, 883 F.2d 895, 898 (11th Cir. 1989).   However, due to the overlap between cause and prejudice and the underlying *Brady* claim, this Court addresses both.   Because the Court considers the merits of Cromartie's *Brady* claim, there is no need to address, at length, his arguments for getting around the procedural bar.   The Court notes, however, Cromartie's argument that the state habeas court's procedural bar determination should be ignored because its analysis "was interwoven with the underlying merits" of the *Brady* claim is meritless.   (Doc. 69 at 73).   Courts frequently combine their procedural default and *Brady* analyses because cause and prejudice necessary to overcome procedural default "'parallel two of the three components of the alleged *Brady* violation itself.'"   *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Strickler*, 527 U.S. at 282).   Also, Cromartie's allegation that procedural default should be excused because he "can demonstrate innocence of the death penalty" is meritless.   (Doc. 69 at 77).   Evidence allegedly kept from the jury due to the *Brady* violation—statements from Cochran and Reddick that they saw Young running from the Madison Street Deli on April 7, 1994—coupled with other witness recantations fail to show that Cromartie is actually innocent of the death penalty for murdering Slysz at the Junior Food Store on April 10, 1994.   *In re Davis*, 565 F.3d 810, 825 (11th Cir. 2009) (finding that recantations of previous testimony "are viewed with extreme suspicion by the court") (quotation marks and citations omitted).

suppression.   *Maharaj v. Sec'y for the Dep't of Corr.*, 432 F.3d 1292, 1315 (11th Cir. 2005) (stating that "[w]here defendants, prior to trial, had within their knowledge the information by which they could have ascertained the alleged *Brady* material, there is no suppression by the government.") (quotation marks and citations omitted); (Doc. 23-37 at 49-54).

The state habeas court also found that Cromartie could not establish prejudice or *Brady* materiality.   (Doc 23-37 at 36-49, 54).   Specifically, the court held that Cromartie "failed to show that had the jury heard the easily impeachable evidence of Reddick or Cochran there was a 'reasonable probability' 'that the outcome of' [Cromartie's] death penalty trial 'would have been different.'"   (Doc. 23-37 at 54).

The record supports these findings.   The State file Cromartie relied on to support his suppression argument showed only that Cochran and Reddick had spoken with detectives—something no one has ever disputed.   (Doc. 21-27 at 107).   It did not show that either reported seeing Young running from the Madison Street Deli on April 7, 1994. Cromartie deposed numerous detectives or, according to the state habeas court, "nearly the entire Thomasville police force that was involved in [Cromartie's] case and the District Attorney's Office" (Doc. 23-37 at 51), and none of them testified that Cochran or Reddick reported seeing Young running from the Madison Street Deli.   (Docs. 21-31 at 20-52, 187-257; 21-32 at 161-202; 23-15 at 62-113).   As the state habeas court pointed out, Cromartie has the burden of proving suppression and while state habeas counsel deposed all of these detectives, they never actually asked any of them if Cochran or Reddick said they saw Young running from the Madison Street Deli on April 7, 1994. (Doc. 23-37 at 32-34).

In short, Cochran's and Reddick's testimony was the only evidence that Cromartie presented to establish the existence of the alleged suppressed evidence.   The state habeas court found their testimony to be unreliable for numerous reasons: both had lengthy criminal records (Doc. 23-37 at 40-41); both were biased for various reasons (Docs. 21-14 at 149-50, 164; 21-15 at 17; 23-37 at 42, 44, 51); Reddick changed his story numerous times and provided contradictory affidavits (Docs. 21-14 at 162-63; 23-37 at 41-43); neither testified that they heard a gunshot on the night of April 7 (Docs. 21-14 at 148; 23-37 at 40, 51); and Cochran unbelievably stated that he was interviewed by trial counsel (or their investigators), but just never mentioned seeing Young running from the Madison Street Deli.[16]   (Docs. 21-15 at 13, 16; 23-37 at 44-45).   Given these findings, which are supported by the record, the state habeas court found "Reddick's and Cochran's testimony is lacking in credibility and does not support [Cromartie's] allegation that the State was in possession of favorable evidence."   (Doc. 23-37 at 52).   "In the absence of clear and convincing evidence, we have no power on federal habeas review to revisit the state court's credibility determinations."   *Bishop*, 726 F.3d at 1259. Cromartie has made no such showing, and, therefore, this Court cannot reconsider the credibility of these two witnesses, both of whom were observed first-hand by the state habeas court.   While this finding alone precludes Cromartie's *Brady* claim, the Court addresses his various arguments.

---

[16] Cochran stated that trial counsel only spoke with him regarding the April 12, 1994 strong-arm robbery, and they asked him no questions about the Madison Street Deli shooting.   (Docs. 21-15 at 13, 16; 23-37 at 44-45).   The state habeas court found this unlikely because Cochran was not involved in any way with the strong-arm robbery; he was not a victim, not a perpetrator, and not a witness.   Plus, trial counsel had "linked" Cochran to the Madison Street Deli shooting, and Cochran was mentioned in trial counsel's file only in connection with the Madison Street Deli shooting.   (Doc. 21-14 at 99).   Thus, as the state habeas court found, it was unlikely that trial counsel would have failed to ask Cochran about the Madison Street Deli when they interviewed him.   (Doc. 23-37 at 23-30, 44-45).

Cromartie argues that the state habeas court's decision does not deserve deference because it contains unreasonable factual determinations and is contrary to, or unreasonably applies, *Brady*.   First, relying on the detective's case summary notes, Cromartie argues that the state habeas court made an unreasonable factual determination when it "concluded that Mr. Cromartie failed to demonstrate that Mr. Cochran and Mr. Reddick gave a total of four statements to police."   (Doc. 69 at 81).

The case summary notes show that on April 11, 1994, Detectives Chuck Weaver and Willie Spencer interviewed David McNeill, who informed them he overheard Cochran telling others "THAT HE HEARD THE SHOTS AND THEN HE AND SOME OTHER GUYS STANDING OUT FRONT, RAN."[17]   (Doc. 21-27 at 107).   According to the notes, the detectives

> FOUND TERRELL COCHRAN . . . .   DET. WILLIE SPENCER WROTE OUT A STATEMENT BY COCHRAN.   TERRELL COCHRAN DID SIGN THIS STATEMENT AT 1245 HOURS ON 4-11-94.   TERRELL ADVISED THAT KEITH REDDICK WAS WITH HIM.   AT THIS TIME WE ARE LOOKING FOR KEITH REDDICK TO GET A STATEMENT FROM HIM CONCERNING WHAT THEY HEARD CONCERNING THIS ROBBERY.

(Doc. 21-27 at 107).   Notes dated April 12, 1994 show that Weaver talked with Spencer and Guy Winklemann and "THEY HAVE REINTERVIEWED TERRELL COCHRAN AND KEITH REDDICK.   NAMES GIVEN ARE KEITH REDDICK, JAMAL HAYES, KEVIN WILLIAMS, ERIC SCOTT, DEON COLEMAN AND MARCO LNU."   (Doc. 21-27 at 107).

The state habeas court did not, as Cromartie argues, find Cromartie failed to prove that Cochran and Reddick gave four statements to the detectives.   (Doc. 69 at 81).

---

[17] In his brief before this Court, Cromartie tries to manipulate this sentence to support his suppression argument.   Citing these same case summary notes, Cromartie states that, "According to McNeil, one of the men, Terrell Cochran, heard the shooting take place **and saw a man run out of the deli immediately afterwards**."   (Doc. 69 at 69) (citing Doc. 21-27 at 107) (emphasis added).   This is a misstatement.   These notes do not show that Cochran reported seeing a man running from the Madison Street Deli.   Instead, they clearly show Cochran reported he ran when he heard shots.   (Doc. 21-27 at 107).

Instead, it found there was one written statement, which was missing, and Cromartie failed to prove any other statements "were memorialized or contained exculpatory information."   (Doc. 23-37 at 32).   It also found that "there is no evidence that the one written statement and the three other interviews of Reddick and Cochran produced any exculpatory evidence or information that Mr. Young was seen running from the Madison Street Deli on the night of the crime."   (Doc. 23-27 at 36).

These findings are supported by the case summary notes and testimony from detectives Weaver, Spencer, and Winklemann.   (Docs. 21-32 at 161-202, 257-86; 21-33 at 1-50; 23-15 at 62-113).   The case summary notes show that Spencer had Cochran sign one written statement.   This statement has never been found.   Spencer testified that he would have turned over any written statements to Weaver, who was the lead investigator on the case.   (Doc. 21-32 at 175, 177-78).   Weaver could not recall if any of Cochran's or Reddick's statements were made part of the file and he left the Thomasville Police Department during the investigation.   (Doc. 21-33 at 32-34).   None of the detectives recalled what Cochran or Reddick told them and, while Spencer said any statement should have been written, none of the detectives could specifically recall obtaining written statements from Cochran or Reddick.   (Docs. 21-32 at 198; 21-33 at 32-34; 23-15 at 95, 97, 99).   Winklemann testified that he did not recall what Cochran or Reddick said in their re-interview or whether he "memorialized" the re-interviews.   (Doc. 23-15 at 98-99).   He stated they would not necessarily obtain a written statement every time they interviewed someone: "If they weren't suspects and they couldn't give us anything pertinent to the case, then they were probably released without any documentation."   (Doc. 23-15 at 102).   Given the record, the state habeas court's

factual findings that one written statement was missing and that Cromartie failed to show the other statements were memorialized or exculpatory were reasonable.   *Holsey*, 694 F.3d at 1257 (stating that a factual finding is "unreasonable only if no 'fairminded jurist' could agree" with it) (citations omitted).

Next, Cromartie argues that the state habeas "court's imposition of a due-diligence standard [on trial counsel] is contrary to *Brady* and its progeny."   (Doc. 69 at 80).   It is not.   The underlying "'purpose of *Brady* is to assure that the accused will not be denied access to exculpatory evidence known to the government but unknown to him.'"   *United States v. Valera*, 845 F.2d 923, 927 (11th Cir. 1988) (citations omitted).   There is no *Brady* violation if the defendant could have obtained the evidence with reasonable diligence.   *LeCroy v. Sec'y., Fla. Dep't of Corr.*, 421 F.3d 1237, 1268 (11th Cir. 2005) (citing *United States v. Meros*, 866 F.2d 1304, 1308 (11th Cir. 1989)).

Finally, Cromartie claims that even if *Brady* imposes a diligence requirement on trial counsel, "the manner in which the state-habeas court imposed that requirement here was objectively unreasonable."   (Doc. 69 at 80).   He states that

> [t]he state-habeas court concluded that counsel should have known about the Reddick and Cochran statements because counsel knew from the police summary report that the pair talked to the police about the Madison Street Deli shooting.   But that is a non sequitur; the *Brady* violation was the suppression of the *statements*, not the suppression of the fact that police talked with the two witnesses.

(Doc. 69 at 80).   Quoting *Strickler*, Cromartie argues that "simply because an attorney is on notice that a witness has talked to police, 'it by no means follows that [defense counsel] would have known that records pertaining to those interviews . . . existed and had been suppressed.'"   (Doc. 69 at 80) (quoting *Strickler*, 527 U.S. at 285).

Unlike the situation in *Strickler*, the state habeas court reasonably found that Cromartie did not even establish the existence of the alleged statements from Cochran and Reddick.   (Doc. 23-37 at 19, 21-22, 36, 45).   Thus, there was nothing to suppress. But, even if the Court assumes the statements did exist, there was still no "suppression" under *Brady* because reasonably diligent counsel could have obtained the information in the statements.   In *Strickler*, the witness whose notes and letters the State suppressed refused to speak with trial counsel prior to trial.   527 U.S. at 285 n.27.   There was, therefore, no reasonable way for trial counsel to learn the information contained in the notes and letters.   Here, both Cochran and Reddick testified that they "would have told Mr. Cromartie's lawyers or investigators about seeing Gary Young had they asked . . . about the Madison Street Deli shooting."   (Doc. 21-31 at 10, 16).   Thus, assuming that Cochran and Reddick actually saw Young running from the Madison Street Deli on April 7, 1994, this information was available to trial counsel.   (Doc. 23-37 at 52).

Having determined that the state habeas court's factual findings and application of the law were reasonable, there was "necessarily at least one reasonable basis on which the [Georgia Supreme Court] could have denied relief."[18]   *Wilson*, 834 F.3d at 1239. This Court, therefore, must deny relief.[19]

---

[18] Alternatively, the state habeas court found Cromartie's *Brady* claim was procedurally defaulted.   (Doc. 23-37 at 18-50).   If the Court assumes the Georgia Supreme Court's denial of relief "rests on the same *general* ground[,]" Cromartie has not shown cause and prejudice, or a fundamental miscarriage of justice, to overcome this default.   *Wilson*, 834 F.3d at 1236.

[19] Cromartie argues that the Court should allow him to conduct discovery to obtain all documents, records, reports, statements, and notes in the possession of the Thomasville Police Department, Thomas County Sheriff's Office, District Attorney's Office, GBI, and Georgia Department of Corrections that relate to or refer to statements made by Reddick and Cochran about the Madison Street Deli shooting.   (Doc. 69 at 179-80). While the state habeas court found Cromartie's *Brady* claim procedurally defaulted, it also reached the merits of the claim and denied relief.   This Court's review, therefore, is "limited to the record that was before the state court" and discovery should not be allowed.   *Pinholster*, 563 U.S. at 181.   Also, Cromartie's state habeas was pending for over eight years before the state habeas evidentiary hearing and, during that time, Cromartie received hundreds of records from these State agencies and deposed

2. <u>Ineffective assistance of counsel regarding the allegedly suppressed statements</u>

*Strickland v. Washington* is unquestionably the clearly established federal law for all ineffective assistance of counsel claims.   466 U.S. 668 (1984); *Blankenship v. Hall*, 542 F.3d 1253, 1272 (11th Cir. 2008).   "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.   First, the defendant must show that counsel's performance was deficient . . . .   Second, the defendant must show that the deficient performance prejudiced the defense."   *Strickland*, 466 U.S. at 687; *Wong v. Belmontes*, 558 U.S. 15, 16 (2009).

To establish deficient performance, Cromartie "must show that counsel failed to act 'reasonabl[y] considering all the circumstances.'"   *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Strickland*, 466 U.S. at 688).   To establish prejudice, Cromartie must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."   *Strickland*, 466 U.S. at 694.   Because Cromartie must establish both deficient performance and prejudice, if he fails to establish one, the Court need not analyze the other.   *Boyd v. Allen*, 592 F.3d 1274, 1293 (11th Cir. 2010).

Cromartie argues that trial counsel were ineffective for failing to procure and present Reddick's and Cochran's statements that they saw Young running from the Madison Street Deli.   (Doc. 69 at 75).   Cromartie states that he failed to brief this claim

---

numerous law enforcement officers.   (Docs. 19-14; 21-14 to 23-20; 23-37 at 51).   Even Cromartie admits that "the existence of the Cochran and Reddick statements has already been subject to substantial litigation in state court."   (Doc. 69 at 181 n.35).   Cochran's written statement referenced in the April 11, 1994 case summary notes was not found during the many years that this case was pending before the state habeas court.   Cromartie gives the Court no reason to believe that it will be found now and no reason to believe, other than Cochran's own discredited testimony, that it contains exculpatory information.   The Court, therefore, **DENIES** Cromartie's request for discovery for Claim Four.   (Doc. 69 at 181).

before the state habeas court, the state habeas court deemed the claim waived, and the claim is, therefore, procedurally defaulted.   (Doc. 69 at 75).   Respondent argues the state habeas court addressed the claim on the merits and denied relief.   The record shows Respondent is correct.

In Claim One of his amended petition for writ of habeas corpus, Cromartie alleged misconduct by the prosecutorial team and stated that "[t]o the extent that the suppressed favorable evidence might have been available to [Cromartie], but his counsel failed to obtain and effectively utilize the information, counsel [were] ineffective . . . ."   (Doc. 20-22 at 5, n.1).   In Claim Two, he alleged trial counsel were ineffective for failing to "adequately investigate the Madison Street Deli shooting incident and present evidence at both phases of the trial that would exculpate [Cromartie]."   (Doc. 20-22 at 7).   He also alleged counsel were ineffective for failing to "investigate and present testimony to implicate other suspects in the shooting incidents for which [Cromartie] was convicted." (Doc. 20-22 at 8).

When discussing Cromartie's *Brady* claim, the state habeas court found that trial counsel "attempted or did in fact interview" Cochran and Reddick prior to Cromartie's trial. (Doc. 23-37 at 23).   The state habeas court also found Claim Two was "properly before [the] [c]ourt for review."   (Doc. 23-37 at 83).   The court discussed the *Strickland* standard and ruled Cromartie "has failed to brief this claim or otherwise present evidence in support thereof, and as he carries the burden of proof, this claim is **DENIED**."   (Doc. 23-37 at 85).

Cromartie filed a motion requesting the state habeas court to reconsider this order because Gary Young, who refused to testify during the state habeas hearing (Doc. 21-15

at 23-29), subsequently denied giving Cromartie his gun on the night of the Madison Street Deli shooting.   (Doc. 23-42).   In the motion for reconsideration, Cromartie argued that the state habeas court had found Cochran and Reddick informed trial counsel that they saw Young running from the Madison Street Deli.   (Doc. 23-42 at 15-21).   The state habeas court made no such finding.   It only found that trial counsel had interviewed or attempted to interview Cochran and Reddick, not that Cochran and Reddick had told them (or anyone else) about seeing Young running from the Madison Street Deli.   (Doc. 23-37 at 23).   The state habeas court denied the motion for reconsideration, finding: "[Cromartie's] attempt to bolster his ineffectiveness claims with findings from this [c]ourt's [f]inal [o]rder are without merit."   (Doc. 24-9 at 3).   The Georgia Supreme Court denied Cromartie's CPC application without explanation.   (Doc. 24-14).   Thus it appears the state courts addressed this particular ineffective assistance claim on the merits.   The question for this Court, therefore, is whether Cromartie has shown there was no reasonable basis for the denial of relief.   *Wilson*, 834 F.3d at 1235.   He has not.

The record shows that trial counsel had the police reports, knew the police had interviewed and obtained statements from various people, including Cochran and Reddick, and knew, based on information obtained from the State, that Cochran and Reddick may have been present at the Madison Street Deli.   (Docs. 21-14 at 73-75; 21-26 at 287, 305; 21-27 at 4).   Regarding Cochran, trial counsel acknowledged that they "obviously . . . had linked him someway to the Madison Deli" and "were trying to find out what he knew or didn't know."   (Doc. 21-14 at 99).   Mears stated they would have followed up on any leads they had regarding witnesses to the Madison Street Deli shooting, (Doc. 21-14 at 97), but he simply did not have "any recollection . . . of having

discussed" this with Cochran.    (Doc. 21-14 at 117).    Trial counsel did have a file with

Cochran's name on it but the file was empty, which Mears explained might indicate the

defense team was unable to locate Cochran.[20]    (Doc. 21-14 at 100).    Regarding

Reddick, Mears recalled Reddick was a witness in a pre-trial hearing on a motion to

exclude the strong-arm robbery as a similar transaction.    (Doc. 21-14 at 72).    Mears

stated he had no recollection of interviewing Reddick, but it was their practice to interview,

or attempt to interview, witnesses before any pretrial hearing.    (Doc. 21-14 at 72, 75,

117).    He testified that "if . . . we thought that he had any knowledge about [the Madison

Street Deli shooting], it would have been unusual for us not to have asked him about it."

(Doc. 21-14 at 73).

Mears stated that his investigators, not trial counsel, normally interviewed

witnesses.    (Doc. 21-14 at 65).    Investigator Pamela Leonard was "in charge of the

investigation."    (Doc. 21-14 at 51).    Despite bearing the burden of proof on these issues,

state habeas counsel offered no testimony from Leonard.    Leonard was assisted by

David Mack, a "parole advocate," who was brought into the case to help with the

investigation and "assist in encouraging Mr. Cromartie to accept [a] plea" that had been

offered.    (Docs. 21-16 at 33-34; 21-14 at 83).    Mack testified that he specifically recalled

Cochran and Reddick and remembered that they were never questioned regarding the

Madison Street Deli shooting.    (Doc. 21-16 at 43-46, 54).    He testified that they were

questioned only regarding the strong-arm robbery.    (Doc. 21-16 at 43-46, 54).    The

state habeas court found Mack was biased and his testimony lacked credibility for several

---

[20] Cochran remembered being interviewed but claimed he was only questioned regarding the strong-arm robbery.    (Doc. 21-15 at 13-16).    As discussed previously, the state habeas court disbelieved this because Cochran had nothing to do with the strong-arm robbery and was only mentioned in trial counsel's files in connection with the Madison Street Deli.    (Doc. 23-37 at 25-32).

reasons: (1) it was "improbable" that Cochran would have been questioned about the strong-arm robbery when he had absolutely no connection to that robbery and his only mention in trial counsel's files was in connection with the Madison Street Deli shooting (Doc. 23-37 at 30); (2) records showed Mack had interviewed numerous other individuals, including Tina Washington, Lisa Young, Emmy Clark, Alonzo Brown, Tanya Frazier, Steve Andrews, and Gary Young, but, when questioned at the state habeas hearing, Mack could not recall being at these interviews and remembered nothing at all about them  (Docs. 21-16 at 49, 51; 23-37 at 30-31); and (3) Mack gave contradictory statements about his involvement with the investigation (Doc. 23-37 at 30-31).   Absent clear and convincing evidence to the contrary, which Cromartie has not presented, this Court presumes the state court's determination that Mack was not credible is correct. *Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011).

The burden is on Cromartie to demonstrate trial counsel's performance was defective.   *Blankenship*, 542 F.3d at 1274 (citations omitted).   "Because of this burden, when the evidence is unclear or counsel cannot recall specifics about his actions due to the passage of time and faded memory, we presume counsel performed reasonably and exercised reasonable professional judgment."   *Id.* (citing *Romine v. Head*, 253 F.3d 1349, 1357-58 (11th Cir. 2001); *Williams v. Head*, 185 F.3d 1223, 1227 (11th Cir. 1999)). Cromartie was tried in September 1997, and Mears was questioned about his performance almost eleven years later in August 2008.   (Doc. 21-14 at 120-21).   Trial counsel testified that they normally would have questioned Cochran and Reddick regarding the Madison Street Deli shooting; he just could not recall doing so due to the passage of time.   (Doc. 21-14 at 72, 75, 117, 120-21).   Thus, the state habeas court

reasonably determined that trial counsel interviewed, or attempted to interview Cochran and Reddick, regarding the Madison Street Deli shooting.   Apparently, Reddick and Cochran failed to tell trial counsel, or anyone else, before Cromartie's state habeas proceedings that they saw Young running from the Madison Street Deli shooting.

Having determined that the state courts reasonably found trial counsel's performance was not deficient; the Court need not address prejudice.   The Court notes, however, that Cromartie has not shown that had the jury heard the "easily impeachable" testimony from Cochran and Reddick, there is a reasonable probability the result of his trial would have been different.   (Doc. 23-37 at 54); *Strickland*, 466 U.S. at 694.   Like the underlying *Brady* claim, this ineffective assistance claim turns on credibility.   Given their records, their changing stories, and the conflicting testimony and evidence, the state courts reasonably found Cochran's and Reddick's statement that they saw Young running from the Madison Street Deli, which did not surface until Cromartie's state habeas proceedings, to be "unreliable" and "tenuous."   (Doc. 23-37 at 54).   As such, their testimony would not "have created a reasonable probability of a different outcome at [Cromartie's] death penalty trial."   (Doc. 23-37 at 54).

Having found the state habeas court's factual findings and application of *Strickland* were reasonable, the Georgia Supreme Court necessarily had at least one reasonable basis for the denial of relief.   *Wilson*, 834 F.3d at 1239.   This Court, therefore, denies relief for this claim.

## E.   CLAIM FIVE: PRESENTATION OF FALSE EVIDENCE

"A *Giglio*[21] claim involves an aggravated type of *Brady* violation in which the suppression of evidence enable[s] the [State] to put before the jury what [it] knew was

---

[21] *Giglio v. United States*, 405 U.S. 150 (1972).

false or misleading testimony . . . ."   *Hammond v. Hall*, 586 F.3d 1289, 1306-07 (11th Cir. 2009) (citing *Ford v. Hall*, 546 F.3d 1326, 1332 (11th Cir. 2008)) (explaining that *Giglio* error, like *Brady*, involves undisclosed evidence).   It is fundamentally unfair to obtain a conviction by the known use of false testimony.   *United States v. Agurs*, 427 U.S. 97, 103 (1976).   Such a conviction "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."   *Id.* (footnotes omitted); *see Giglio,* 405 U.S. at 154 (finding that "[a] new trial is required 'if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury'") (quoting *Napue v. Illinois*, 360 U.S. 264, 271 (1959)).   To prevail, a petitioner must show "(1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material—i.e., that there is 'any reasonable likelihood' that the false testimony 'could . . . have affected the judgment.'" *Davis v. Terry*, 465 F.3d 1249, 1253 (11th Cir. 2006) (quoting *Giglio*, 405 U.S. at 154). "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule."   *Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 269).

Cromartie argues that three key State witnesses—Gary Young, Carnell Cooksey, and Corey Clark—presented false testimony that the State failed to correct.

### 1.   <u>Gary Young</u>

Cromartie makes two arguments regarding Young's testimony.   First, he argues that the State failed to correct Young's false testimony that only one criminal charge against him had been dismissed in exchange for his testimony against Cromartie.   (Doc. 69 at 85).   Second, he argues the State failed to correct Young's "known false" testimony

that he gave Cromartie a gun the night before the Madison Street Deli shooting and that

Cromartie told him about shooting the Madison Street Deli clerk.   (Doc. 69 at 86-87).

       a.   Testimony regarding dismissed charges

Young was arrested and indicted for aggravated assault, aggravated battery, and

possession of a firearm by a convicted felon in connection with the Madison Street Deli

shooting.   (Docs. 18-13 at 90-91; 18-22 at 95).   He gave a statement implicating

Cromartie in the crimes.   (Docs. 17-7 at 250-51; 18-14 at 1-37).   The State

subsequently dismissed charges against Young.   Trial counsel questioned Young

regarding the dismissal:

> Q. Okay. . . .   The case against you from the Madison Street Deli was
> dismissed some time after you gave your statement to the police; wasn't it?
>
> A. I don't know. . . .
>
> Q. Okay. . . .   Were ever any cases dismissed against you for any reason?
>
> A. Was there?
>
> Q. Um-hum (affirmative).
>
> A. The only case dismissed from me was, uh, was this right here.

(Doc. 18-13 at 90).

Cromartie argues "Young did not answer those questions truthfully, and the [State]

knew it."   (Doc. 69 at 85).   He alleges Young failed to disclose that, three years after he

gave his statement about the Madison Street Deli shooting and just four months prior to

Cromartie's trial, he was arrested for possession with intent to distribute cocaine and

marijuana on May 7, 1997.[22]   (Doc. 69 at 85).   He also argues that Young failed to

_____

[22]  Young was arrested on May 7, 1997 because he was "present at the time of the search warrant" when
agents searched a residence belonging to Kimberly Bryant.   (Doc. 22-1 at 14).   Agents found crack
cocaine, powder cocaine, and marijuana in her home.   (Doc. 22-1 at 14).   When Bryant was searched, the

disclose that the State was not going to prosecute him for the "half-kilogram of cocaine" that he had buried in a neighbor's yard.[23]   (Doc. 69 at 85).   According to Cromartie's argument to the state habeas court, the State agreed not to prosecute Young for these crimes in exchange for his testimony at Cromartie's trial.   (Doc. 23-37 at 67).

The state habeas court denied this *Giglio* claim on the merits:

> [Cromartie] alleges the State did not prosecute Gary Young on a drug related offense in exchange for his testimony at trial.   The only evidence [Cromartie] presented to this Court to support this portion of his Giglio claim is an indictment and the unsubstantiated testimony of a witness, Kimberly Bryant, who was involved in illegal drug activities.   As none of this evidence would have been admissible during [Cromartie's] trial, and does not prove the State had promised Young any type of deal in exchange for his testimony, this Court finds [Cromartie] has failed to prove this Giglio claim.

> Three years after Young had provided his statement to the police regarding the crimes for which [Cromartie] received the death penalty, Young was arrested for selling illegal drugs.   Other than the indictment stating Young possessed illegal drugs with the intent to distribute, [Cromartie] has failed to present any evidence regarding this alleged crime.   [Cromartie] claims Young was not prosecuted for this crime in exchange for his testimony at [Cromartie's] trial however, [sic] there is nothing in the record before this Court to support this contention.   It could just as easily be stated that the State did not pursue this case because it lacked the necessary evidence to support a conviction.   In fact, [Cromartie] has failed to present any evidence that Young has been involved in any criminal activity since this indictment in 1997.

> [Cromartie] also presented the unsubstantiated testimony of Kimberly Bryant that she once informed the police that Young had buried half of a kilogram of cocaine in a neighbor's backyard and the State chose not to arrest Young for this in exchange for his testimony at [Cromartie's] trial.

---

agents found marijuana in her pants pocket.   (Doc. 22-1 at 14).   No drugs were found on Young's person. When interviewed, Bryant told the police that the crack cocaine, powder cocaine, and marijuana belonged to her.   (Doc. 22-1 at 14-15, 20).   She said that both she and Young were using powder cocaine just before the search, and Young threw some of the cocaine down the kitchen sink as the agents entered her residence.   (Doc. 22-1 at 15, 20).   Young admitted that he used cocaine, but claimed that he did not know Bryant had any drugs in her home.   (Doc. 22-1 at 15).

[23]  The only evidence of this crime is an affidavit that Kimberly Bryant gave Cromartie's state habeas counsel.   (Doc. 21-31 at 2-3).   In the affidavit, she testified that she cooperated with police following her May 7, 1997 arrest and told them Gary Young had buried a cigar box containing "one-half kilo of cocaine" in his neighbor's yard.   (Doc. 21-31 at 2-3).

[Cromartie] cites to a letter written by an officer in the Thomasville Narcotics Vice Division as proof that Ms. Bryant informed the police of Young's actions, however, the letter relied upon does not support [Cromartie's] claim.

(Doc. 23-37 at 67-69) (citations and footnotes omitted).   The Georgia Supreme Court denied Cromartie's CPC application without explanation.   (Doc. 24-14).   The question, therefore, is whether Cromartie has shown there was no reasonable basis for the Georgia Supreme Court to deny relief.   *See Wilson*, 834 F.3d at 1235.   He has not.

First, Cromartie has failed to show that Young testified falsely at trial.   Young was questioned whether any charges against him had been dismissed.   He correctly testified that only charges related to the Madison Street Deli shooting had been dismissed. Charges stemming from Young's May 7, 1997 arrest for possession with intent to distribute marijuana and cocaine were still pending at the time of Cromartie's September 1997 trial.   (Doc 23-32 at 89-90).   No charges have ever been pending or dismissed based on Young's alleged burial of cocaine in his neighbor's yard.   Because Young's testimony was not false, there was nothing for the State to correct.   *See Hammond*, 586 F.3d at 1307 (finding *Giglio* requires "[t]he testimony or statement elicited or made must have been a false one").

Second, Cromartie presented no evidence to show that the State agreed not to prosecute Young for the May 7, 1997 offense or the buried cocaine in exchange for his testimony in Cromartie's trial.   In fact, as the state habeas court found, the evidence suggests that the State did not pursue prosecution for the possession with intent to distribute charges because it did not have enough evidence to secure a conviction.   The cocaine and marijuana seized on May 7 were found in Kimberly Bryant's residence and on her person.   (Doc. 22-1 at 14-15).   She told law enforcement that all of the drugs

belonged to her.   (Doc. 22-1 at 14-15).   No drugs were found on Young's person.

Thus, it is reasonable to assume that law enforcement did not think they could obtain a

conviction against Young.   The only evidence regarding Young's possession of buried

cocaine is an unsubstantiated[24] affidavit from Kimberly Bryant.   According to Bryant, she

informed the authorities of this cocaine and they dropped all outstanding charges against

her.[25]   But there is absolutely no evidence the State agreed not to press charges against

Young relating to this cocaine if he testified against Cromartie.   As Respondent points

out, Young certainly did not testify like a witness who hoped to benefit from his testimony.

(Doc. 75 at 147).   Young repeatedly testified he did not know who shot the clerks at the

Madison Street Deli and the Junior Food Store; that he had forgotten any conversation he

had with Cromartie; and that he could not recall the statement he gave police about the

shootings.   (Doc. 18-13 at 43-44, 52, 56-57, 60).   He was so un-cooperative, he had to

be declared a hostile witness.   (Doc. 18-13 at 44).

Third, the record shows trial counsel was well-aware of Young's pending drug

charges.   In an August 15, 1997 pretrial hearing, trial counsel asked for any additional

---

[24] Cromartie argues that the state habeas court made an unreasonable finding of fact when it characterized Bryant's affidavit as "unsubstantiated." (Doc. 69 at 93).   It did not.   There was no other evidence before the state habeas court showing that Young buried "a half kilo of cocaine" in his neighbor's yard.   Her affidavit was, therefore, "unsubstantiated." (Doc. 23-37 at 68).

[25] While evidence indicates that charges were dismissed against Bryant because she assisted law enforcement, there is no evidence to support Bryant's statement that her drug charges were dismissed because she told authorities about cocaine Young buried in his neighbor's yard.   (Doc. 21-12 at 3).   In a December 22, 1997 letter, Agent Kevin Lee requested that the district attorney dismiss Kimberly Bryant's pending drug charges because she "assisted Agent Lee in arresting a subject with over two ounces of cocaine" and in "arresting two subjects for Possession of Cocaine with Intent to Distribute and one subject with Possession of Marijuana with Intent to Distribute." (Doc. 20-41 at 17).   Lee states he "could not have arrested these subjects without the help of Kimberly Bryant." (Doc. 20-41 at 17).   The letter does not mention Young.   The letter mentions four arrests as a result of Bryant's tips, and Young was not arrested following Bryant's alleged tip regarding the buried cocaine.   And the letter mentions the seizure of drugs while no drugs were seized from Young following Bryant's alleged tip.   It therefore seems unlikely that the dismissal of charges against Bryant had anything to do with information she provided about Young's buried cocaine.

mitigating evidence that the State might have.   (Doc. 17-27 at 21).   The State

responded that "Young, as they're well aware of, has been arrested.   He's in jail but not

been convicted of anything."   (Doc. 17-27 at 22).   On August 21, 1997, trial counsel

requested a certified copy of the "charging docs." for Young's 1997 "Poss./Distribution."

(Doc. 17-6 at 210-11).   Trial counsel's files show the booking number and date of

Young's May 1997 arrest and contain copies of Young's Thomas County Detention

Center records following his drug arrest.   (Doc. 22-12 at 200, 218-22).   Thus, there

simply was no "undisclosed evidence."   *Ventura v. Att'y Gen., Fla.*, 419 F.3d 1269,

1276-77 (11th Cir. 2005) (explaining that "*Giglio* error is a species of *Brady* error that

occurs when 'the **undisclosed evidence** demonstrates that the prosecution's case

included perjured testimony.'") (emphasis added) (citations omitted).

Citing *Davis v. Alaska*, 415 U.S. 308 (1974), Cromartie argues the state habeas

court unreasonably found the indictment for Young's May 7, 1997 offense would not have

been admissible at trial and unreasonably found that, other than the indictment,

Cromartie failed to present any evidence regarding the May 7, 1997 offense.   Cromartie

argues that

> [i]t was not necessary for Mr. Cromartie to present any evidence of the
> underlying crime to impeach Mr. Young.   Under *Davis*, Mr. Cromartie
> needed simply to present evidence that Mr. Young had a pending
> drug-dealing case at the time of his testimony to demonstrate Mr. Young's
> motive to curry favor with the [S]tate.   Mr. Cromartie never had this
> opportunity because the prosecutor failed to disclose the charges, and then
> failed to correct Mr. Young when he was asked on cross examination about
> his criminal cases.

(Doc. 69 at 92).

Cromartie's arguments fail for several reasons.   Most significantly, the Court fails

to see the relevance of *Davis*.   In *Davis*, the Court held that the petitioner was denied his

rights under the Confrontation Clause to adequately cross-examine a witness when the court prohibited trial counsel "from making inquiry as to the witness' being on probation under a juvenile court adjudication."   415 U.S. at 313.   In this case, Cromartie is not arguing that the trial court prohibited trial counsel from inquiring into Young's pending criminal charges.   Instead, Cromartie is arguing that the State knowingly allowed Young to testify falsely when he said no other criminal charges against him had been dismissed. But, this testimony was not false.   The State had not dismissed any other case against Young.   Young's drug charges came three years after he gave his statement to police, and these charges were still pending at the time of Cromartie's trial.     Also, the record belies Cromartie's argument that trial counsel could not inquire into Young's pending drug charges because the State "failed to disclose the charges."   (Doc. 69 at 92).   As explained above, the record clearly demonstrates that the State was not hiding Young's pending charges.   (Doc. 17-27 at 22).

  b. <u>Young's changing testimony</u>

  Cromartie argues that Young testified falsely when he stated that he gave Cromartie his gun before the Madison Street Deli shooting and that Cromartie told him about shooting the Madison Street Deli clerk.   (Doc. 69 at 86).   The only evidence to support this allegation is Young's state habeas recantation of his testimony, which the state habeas court found to be "unreliable."[26]   (Doc. 24-9 at 2).   Other than alleging Young was "pressured when interviewed by police" and "knew many details of that

---

[26] Young's testimony was constantly changing.   He initially told police that he did not know where Cromartie got the gun.   (Doc. 18-13 at 68, 80-81).   Next, he told police he gave Cromartie the gun.   (Doc. 17-7 at 250-51).   At trial, he claimed to have no knowledge of who shot the clerk at the Madison Street Deli and stated that he forgotten any conversations he previously had with Cromartie.   (Doc. 18-13 at 43-44, 52).   Then he acknowledged Cromartie told him that he shot the Madison Street Deli clerk, but he could not recall Cromartie telling him about the Junior Food Store shooting.   (Doc. 18-13 at 52, 56-57).

shooting," Cromartie does not explain how Young's recantation establishes the State
"knowingly" used perjured testimony.   (Doc. 69 at 86); *Davis*, 465 F.3d at 1253.   The
state habeas court denied this *Giglio* claim on the merits, finding that Young's recantation
"does not show that the State coerced Mr. Young, suppressed evidence regarding Mr.
Young's alleged involvement in the Madison Street Deli shooting of Mr. Wilson, or falsely
presented testimony from Mr. Young."   (Doc. 24-9 at 2) (citations omitted).   The state
habeas court determined that:

> Although Mr. Young has now provided testimony that he did not give his
> gun to [Cromartie] on the night of the Madison Street Deli incident and that
> [Cromartie] did not confess involvement in the shootings to Mr. Young, Mr.
> Young denied he was coerced by the State to fabricate his pre-trial
> statements or his trial testimony.   Additionally, Mr. Young did not provide
> any testimony that the State suppressed any evidence that Mr. Young was
> lying or that the State had any reason to know that Mr. Young was testifying
> falsely at trial.

(Doc. 24-9 at 2-3).

This *Giglio* claim turns, in part,[27] on credibility.   "We consider questions about the
credibility and demeanor of a witness to be questions of fact," which are "afford[ed] a
presumption of correctness."   *Consalvo,* 664 F.3d at 845.   Cromartie has not presented
any, much less clear and convincing, evidence to overcome the presumption that the
state habeas court correctly found Young's recantation unreliable.   The Court, therefore,
denies this claim.

---

[27]  The Court states "in part" because even if Young's recantation was found to be reliable, Cromartie still
has not presented any evidence showing the State had reason to know Young was not being truthful in his
statement or his trial testimony.   In his recantation, Young testified: the authorities did not tell him "to say it
was Mr. Cromartie who did the shooting" (Doc. 23-47 at 10); neither the State nor the Thomasville Police
Department told him to say that he gave Cromartie his handgun (Doc. 23-47 at 14, 29); and neither the
State nor the Thomasville Police Department told him to say that Cromartie confessed to shooting the
Madison Street Deli clerk.   (Doc. 23-47 at 29).   Young's own testimony shows he was not coerced into
testifying falsely or that the State had any reason to know he was testifying falsely.   Thus, there is no *Giglio*
violation.   *See Giglio*, 405 U.S. at 154.

2.   Carnell Cooksey

Carnell Cooksey was arrested for the April 12, 1994 strong-arm robbery of Reddick and Brown.   (Docs. 21-45 at 99-100; 23-15 at 77).   When officers started to question him about the robbery, he reported that he had information about the Madison Street Deli and Junior Food Store shootings.   (Docs. 21-45 at 103; 23-15 at 77).   In his pretrial statement and during trial, Cooksey testified: He was at Tina Washington's house on the night of the Madison Street Deli shooting and witnessed Young give Cromartie a handgun (Docs. 18-12 at 107-08; 21-45 at 104-05, 108-09, 113); Cromartie and others showed up at Tonya Frazier's house with a case of Budweiser on the night of the Junior Food Store shooting (Docs. 18-12 at 113; 21-45 at 107, 109-10, 117); and Cromartie told him he shot the clerk at the Junior Food Store twice in the face, was unable to open the cash register, and grabbed some beer and ran.   (Docs. 18-12 at 114, 117-18; 21-45 at 110, 120). Cooksey also told investigators he was drunk during the weekend of the Junior Food Store shooting and admitted on cross-examination during trial that he had "been drinking a pretty good bit" and was "pretty drunk" on the night of the Junior Food Store shooting. (Docs. 21-45 at 118-19; 18-12 at 123).

Eight years after Cromartie's trial, Cooksey changed his story.   In a September 17, 2005 affidavit, Cooksey stated: The Thomasville police threatened to charge him with murder and send him to the electric chair for the Madison Street Deli and Junior Food Store shootings (Doc. 21-31 at 11-12); the police suspected Young's involvement in these shootings and to protect Young, Cooksey told the investigators that he "thought Jeff Cromartie did the shootings" (Doc. 21-31 at 12); Cromartie never told him that he shot anyone (Doc. 21-31 at 13); Young and Corey Clark told him that Cromartie shot the

Madison Street Deli and Junior Food Store clerks (Doc. 21-31 at 13-14); he did not see

Young give Cromartie his gun (Doc. 21-31 at 13); he was drunk on the night of the Junior

Food Store shooting and has no recollection of that night (Doc. 21-31 at 13); he does not

know who shot the clerks at either of the convenience stores (Doc. 21-31 at 14); and the

police threatened to arrest him if he did not testify at Cromartie's trial.   (Doc. 21-31 at 14).

    Approximately three years later, at Cromartie's state habeas evidentiary hearing,

Cooksey testified that he implicated Cromartie because the police told him to:

> A. And I told them what I had heard from them because, like I said, I was
> scared.   And sometimes during the questioning they would turn the tape
> off.
>
> Q. What would happen when they'd turn the tape off?
>
> A. They would, like, not actually tell me what to say but they would put it in a
> question form, what to say.   So, and once they done that they'd turn the
> tape back on and ask the question again, and I would just pretty much say
> what they wanted to hear.

(Doc. 21-14 at 129-30).   He testified that he never saw Young give his gun to Cromartie

and he does not know what happened at either the Madison Street Deli or the Junior Food

Store.   (Doc. 21-14 at 130).

    The state habeas court addressed Cromartie's argument that the State coerced

Cooksey into providing false testimony.   It found Cromartie had "failed to present any

corroborating evidence to support his allegations and, more importantly, failed to show

that the State was aware that Cooksey allegedly testified falsely during [Cromartie's] trial."

(Doc. 23-37 at 70).   The court pointed out that, until the state habeas hearing, Cooksey

never indicated that the police pushed him to implicate Cromartie.   (Doc. 23-37 at 71-72).

That allegation was at odds with his 2007 affidavit, in which he testified that he implicated

Cromartie because he was scared and wanted to protect Young, on whom the police

were focusing.   (Doc. 23-37 at 71-72).   The allegation was also at odds with testimony from one of the interviewing officers, who said Cooksey voluntarily started talking about the murder at the Junior Food Store.   (Doc. 23-37 at 71).   Also, the police transcripts did not show any evidence of coercion.[28]   (Doc. 23-37 at 73-75).   The state habeas court also noted that the level of detail Cooksey provided in his pretrial statement contradicted his more recent claim that Cromartie did not tell him about the Junior Food Store shooting and that he was too drunk to remember what happened the night of that shooting.[29] (Doc. 23-37 at 74).   Ultimately, the state habeas court found Cromartie failed to prove Cooksey's trial testimony was false and failed to show the State knew that Cooksey was allegedly testifying falsely.   (Doc. 23-37 at 70).

Cromartie argues that the state habeas court made an unreasonable factual determination when it "rejected this claim on the basis that Mr. Cromartie 'failed to present any corroborating evidence to support his allegations.'"   (Doc. 69 at 93) (quoting Doc. 23-37 at 70).   Cromartie cites Young's recantation as corroboration of Cooksey's testimony that he did not see Young give Cromartie his gun on the night of the Madison Street Deli shooting.   (Doc. 69 at 93).   But, it was only after the state habeas court

---

[28]  The state habeas court also pointed out that, contrary to Cooksey's testimony that he was scared of being charged with the Madison Street Deli and Junior Food Store shootings, there was no evidence in the record showing that he was ever suspected or accused of these crimes.   (Doc. 23-37 at 72-73).

[29]  To support its finding that Cooksey provided detailed information about the night of the Junior Food Store shooting, the state habeas court quoted this portion of Cooksey's pretrial statement to police: "So I'm not gonna (sic) say who went with him.   I'm not gonna (inaud).   So, he, uh, they came back with some beer.   I woke up bout (sic) round four or five and they had some beer in the refrigerator.   And it was busted.   It was a case of Budweiser.   Twelve ounce cans.   It was busted and some of it had mud on it.   And so, after that, you know, I asked them where'd they get it from.   Then, you know [Cromartie], called me and [Young] out the door and told us.   You know, what went on.   Say he shot the clerk in the face twice.   Then he tried to open the cash register.   He got the beer first.   He tried to open the cash register and he couldn't.   So, he grabbed the beer and ran out the store.   And he say he was droppin (sic) it and he was runnin (sic), pickin (sic) it up and he said he dropped two of em (sic) that he hadn't picked up.   They [were] in a mud puddle. And he left those two there.   And that was basically what happened.   And he say he didn't have any more shells.   Say he didn't have but two shells when he went."   (Doc. 23-37 at 74-75) (quoting Doc 21-45 at 110).

issued its February 8, 2012 final order that Cromartie came forward with Young's recantation.   (Doc. 24-9 at 1).   Therefore, at the time the state habeas court found Cooksey's recantation uncorroborated, it was, in fact, uncorroborated.   After receiving "an affidavit from Gary Young in support of [Cromartie's] *Brady* . . . and *Giglio* . . . claims," the state habeas court reopened the evidence to allow Young to be deposed.   (Doc. 24-9 at 1).   After considering Young's testimony, the state habeas court found, "the affidavit and deposition testimony of Mr. Young do not justify vacating this [c]ourt's final order." (Doc. 24-9 at 3).   Cromartie has not shown that the state habeas court unreasonably decided not to use Young's recantation testimony, which it found to be lacking in credibility, to support Cooksey's recantation, which it also found to be lacking credibility. Plus, as Respondent points out, even if Young's recantation supports Cooksey's claim that he never saw Young give Cromartie his gun, it does nothing for Cooksey's claim that the police coerced him into implicating Cromartie.   Without this, Cromartie has not established that the State knowingly used false testimony and, therefore, has not asserted a viable *Giglio* claim.

As with Young, the state habeas court was in the best positon to determine Cooksey's credibility.   "Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review."   *Consalvo*, 664 F.3d at 845.   Cromartie has not presented clear and convincing evidence to overcome the state court's determination that Cooksey's recantations and claims of police coercion lack credibility.   The Court, therefore, denies relief.

3.   Corey Clark

Clark, one of Cromartie's co-defendants, testified that Cromartie shot Slysz. (Doc. 18-15 at 140, 144).   Clark testified that he was with Cromartie in the Junior Food Store on April 10, 1994, and he was originally charged with being a party to the crimes of murder and armed robbery.   (Doc. 18-15 at 130, 147).   He testified that he could have been sentenced to death if found guilty of murder.   (Doc. 18-15 at 149).   Instead, in exchange for his testimony against Cromartie, he was allowed to plead guilty to robbery and hindering the apprehension of a criminal.   (Doc. 18-15 at 130, 149, 153).   He was sentenced to twenty-five years in prison.   (Doc. 18-15 at 130).   Clark testified that when he decided to plead guilty, he did not know he would receive the twenty-five year sentence.   (Doc. 18-15 at 131).   Clark told the jury that the murder and armed robbery charges were dismissed "all in exchange for [his] testimony."   (Doc. 18-15 at 153, 184).

Clark submitted an affidavit to the state habeas court in which he claimed he had an additional, undisclosed inducement to testify against Cromartie: His trial counsel, Gail Lane, told him the prosecutor would reduce his sentence to five years in exchange for his testimony.   (Doc. 21-31 at 7).

Cromartie maintains that the state habeas court found this claim procedurally defaulted.   (Doc. 69 at 89-90).   The state habeas court found some of Cromartie's *Giglio* claims related to Clark were procedurally defaulted, but not this particular one.   In the state habeas proceedings, Cromartie made several *Giglio* arguments concerning Clark's testimony.   Specifically, he argued that Clark's testimony at trial was false and misleading because it was inconsistent with his pretrial statement to police, an August 24, 1994 letter Clark wrote to the District Attorney's office, and his testimony during his guilty

plea.   (Doc. 23-37 at 55).   The state habeas court found that claim procedurally

defaulted:

> Clark's statements and testimony prior to trial were in the possession of trial
> counsel and therefore available for argument at trial, at [Cromartie's] motion
> for new trial and on direct appeal.   Consequently, the [c]ourt finds this
> <u>Giglio</u> claim is procedurally defaulted as [Cromartie] has failed to provide
> this Court with an argument showing cause to overcome the procedural bar
> to this claim.

(Doc. 23-37 at 55-56).

But that is not the claim he makes here.   Again, his claim here is that Clark's

attorney informed him the prosecutor offered an unwritten deal of five years in prison if

Clark testified against Cromartie.   Cromartie also made this claim in the state habeas

court, and the court denied relief on the merits, finding Cromartie "failed to prove the

necessary prongs of his <u>Giglio</u> claim" because he "failed to present any credible evidence

that Clark was promised a reduction in his sentence following his testimony at

[Cromartie's] trial."   (Doc. 23-37 at 67).   The Georgia Supreme Court then denied relief

without explanation.   (Doc. 24-14).   To obtain habeas relief, Cromartie must show there

was no reasonable basis for that denial.   *See Wilson*, 834 F.3d at 1235.   He has not

done so.

As the state habeas court found, Clark's affidavit was the only evidence offered to

support Cromartie's claim that Clark was offered an unwritten deal of five years if he

testified against Cromartie.   (Doc. 23-37 at 64).   Clark refused to testify at Cromartie's

state habeas evidentiary hearing.[30]   (Doc. 21-15 at 22).   His trial counsel, who had

allegedly informed him of the unwritten plea deal, did testify.   Lane testified that there

---

[30]  Respondent subpoenaed Clark to appear at the state habeas evidentiary hearing.   (Doc. 21-15 at 20).
As it did with other witnesses who had previously testified at Cromartie's trial, the state habeas court
advised Clark of the penalties for perjury in a death penalty case.   (Doc. 21-15 at 21-22).   Clark invoked
his Fifth Amendment rights and refused to testify.   (Doc. 21-15 at 22).

was no agreement ahead of time as to what Clark's sentence would be when he pleaded

guilty.   (Doc. 21-16 at 7).   Instead, it was a "blind plea," in which the sentence was left up

to the judge.   (Doc. 21-16 at 7).   She testified that "all of us expected the maximum

sentence," and she never would have told Clark that he would only receive five years.

(Doc. 21-16 at 7).   She stated that "a five year sentence under the circumstances of this

case was just totally outside the realm of possibility."   (Doc. 21-16 at 7).   Lane

unequivocally refuted Clark's allegation that she informed him the twenty-five year

sentence would be reduced following his testimony at Cromartie's trial.   (Doc. 21-16 at 9,

22-23).   The state habeas court found that Lane's live testimony "effectively rebutted"

Clark's affidavit testimony.   (Doc. 23-37 at 64).

        As with Young and Cooksey, Cromartie's *Giglio* claim involving Clark turns on

credibility.   As such, the Court presumes the state habeas court correctly credited Lane's

live testimony over Clark's affidavit testimony.   Cromartie has not presented clear and

convincing evidence to overcome this presumption of correctness.   *See Consalvo*, 664

F.3d at 845.

        Having found the state habeas court's factual findings and application of *Giglio*

were reasonable, the Georgia Supreme Court necessarily had at least one reasonable

basis for the denial of relief.   *See Wilson*, 834 F.3d at 1239.   This Court, therefore,

denies relief for Claim Five.

## F.   CLAIMS SIX AND SEVEN: THE MADISON STREET DELI SURVEILLANCE VIDEO

        The Madison Street Deli surveillance video from the night of April 7, 1994 is

approximately two hours long.   (Doc. 18-11 at 147).   It is undisputed that Cromartie

cannot be identified on the video.   (Doc. 18-11 at 216).   The State sought to introduce

about twenty minutes of the footage surrounding the actual shooting.   (Doc. 18-11 at

208).   After a pre-trial hearing, trial counsel objected on the basis of lack of foundation,

insufficient chain of custody, and because they had not seen the entire two hours of the

video.   (Docs. 18-11 at 214-20; 18-12 at 1-3).   The trial court gave trial counsel the

opportunity to view the entire video and told them to notify the court of any other relevant

portions of the video.   (Docs. 18-11 at 215, 218-19; 18-12 at 2-3).[31]   The trial court

informed them that

> unless [it was] shown that something is relevant on that other hour and forty
> minutes, then [it was] not going to sit here and spend an hour and forty
> minutes watching something that . . . sheds no light whatsoever and is not
> going to help these jurors whatsoever in deciding the issues . . . .

(Doc. 18-11 at 215).

    After viewing the video, trial counsel argued the entire two hours should be shown

to the jury because it shows individuals entering and leaving the convenience store; it was

unclear when some of the other customers left the store; and there was a ten to fifteen

second break in the tape at some point.   (Doc. 18-12 at 6-8).   Trial counsel maintained

that the jury should be able to consider whether the persons going in and out of the store

were "scouting out the store" or acting as a lookout for others.   (Doc. 18-12 at 9).   The

trial court disagreed:

> [A]t this time I do not feel that any portions of the videotape, other than the
> portions showing the actual incident which is being tried . . . are relevant.
> You know, the fact that other persons went in the store, the fact that
> someone might surmise or speculate that someone may have been casing
> the store, so to speak, or acting as a lookout, so to speak, there's nothing on
> the videotape to raise more than a bare conjecture or speculation as to that.

(Doc. 18-12 at 11).

---

[31]  The trial court also viewed the entire video.   (Doc. 18-17 at 63).

During Cromartie's trial, trial counsel objected again to the admission of the twenty-minute segment of video, again requesting that the entire two hours be shown to the jury or, alternatively, other segments, which they deemed relevant, be played for the jury.   (Doc. 18-17 at 62, 64).   Trial counsel argued that other individuals going in and out of the convenience store during the two hours shown on the video might be Gary Young, but they acknowledged they could not identify Young on the video.   (Doc. 18-17 at 65-66).   The trial court stated that "there is no evidence that anyone else, other than one individual that came into the store that is depicted on the video was involved in the [shooting]."   (Doc. 18-17 at 73).   The trial court, therefore, ruled it would not play the entire two-hour video, but would allow trial counsel to play the portion they alleged might be Young, and any other portion they could establish was relevant.   (Doc. 18-17 at 69, 71-74).   Trial counsel ultimately objected to playing just a portion of the video on the grounds that they wanted the jury to see the entire two hours.   (Doc. 18-17 at 74).

The jurors saw at least a portion of the twenty-minute video twice during Cromartie's trial, the full twenty minutes once at regular speed with audio and the first part of the twenty minute video once in slow motion without audio.   (Doc. 18-12 at 86).   At the jurors' request, they watched both the regular speed and the slow motion version again during deliberations. (Doc. 18-19 at 36-47).   The tape was "too indistinct to conclusively identify Cromartie" and no one testified that Cromartie was the person shown on the tape.   *Cromartie*, 270 Ga. at 781, 514 S.E.2d at 209.

Cromartie argues that his rights to a fair trial and due process under the Fifth, Sixth, and Fourteenth Amendments were violated when the trial court denied his motion to exclude the twenty-minute video.   (Doc. 69 at 95).   Cromartie states that the video

was irrelevant—it did not reveal the identity of the shooter—and prejudicial—it showed

the "pain that store clerk Dan Wilson endured after the shooting as he called for and

eventually received help from paramedics."   (Doc. 78 at 49).   He also argues that, even

assuming the introduction of the twenty-minute video was not by itself unconstitutional,

his rights to due process and to present a defense under the Fifth, Sixth, and Fourteenth

Amendments were violated when the trial court refused to play the entire two-hour video.

(Doc. 69 at 98).

> On direct appeal, the Georgia Supreme Court held:
>
> The trial court did not abuse its discretion in admitting, after a proper
> foundation had been laid, the 20-minute portion of the Madison Street Deli
> surveillance video that depicted the assailant entering the store, the sound
> of the shot, the assailant's attempt to open the cash register, and the arrival
> of law enforcement.
>
> Nor did the trial court err in denying Cromartie's request to show the entire
> videotape.   Cromartie argued that the entire two-hour videotape was
> relevant because it shows a customer who might resemble his cousin, Gary
> Young (the man who supplied Cromartie with the murder weapon), enter
> the store prior to the shooting and also shows unidentified people entering
> and leaving the store who could have been "scouting" for the shooter.   The
> trial court allowed Cromartie to play for the jury that portion of the videotape
> showing a customer who may look like Gary Young and stated that it would
> admit other portions of the videotape if Cromartie identified the specific
> portions believed to be relevant.   Cromartie refused to identify other
> portions of the videotape he believed to be relevant and instead insisted
> that the entire videotape be shown.   We conclude the trial court did not
> abuse its discretion in denying the motion to show the entire videotape in
> that Cromartie failed to show how an hour-and-forty minute depiction of
> customers shopping at the store was relevant.

*Cromartie*, 270 Ga. at 786, 514 S.E.2d at 212-13 (citations omitted).

Cromartie faults the Georgia Supreme Court for denying relief in a "conclusory

fashion," and argues the decision was "'contrary to' clearly established federal law"

because the court failed to cite controlling Supreme Court precedent.   (Doc. 69 at 97)

(citation omitted).   State courts do not have to provide explanations for their decisions. *Blankenship*, 542 F.3d at 1271.   This Court must give the same deference to summary adjudications as it does to those accompanied by explanations into the state court's rationale.   *Id.*   Also, a state court is not required to "cite or even be aware of Supreme Court precedent."   *Clark v. Att'y Gen., Fla.*, 821 F.3d 1270, 1282 (11th Cir. 2016) (citing *Early v. Packer*, 537 U.S. 3, 8 (2002)); *see also Esparza*, 540 U.S. at 16 ("A state court's decision is not 'contrary to . . . clearly established Federal law' simply because the court did not cite [Supreme Court] opinions.") (citation omitted).   All that is required of a state court's decision is that it not contradict clearly established federal law.   *Esparza*, 540 U.S. at 16 (quoting *Early*, 537 U.S. at 8).   The Georgia Supreme Court's decision passes this test.

Without much explanation, Cromartie argues that the Georgia Supreme Court's decision upholding the presentation of the twenty-minute video constituted an unreasonable application of *Dowling v. United States*, 493 U.S. 342 (1990).   To the contrary, if anything, this factually-dissimilar case supports the state court's ruling.   In *Dowling*, the defendant was tried for bank robbery.   493 U.S. at 344.   A witness testified that the defendant, wearing the same type of mask, with the same type of gun, and accompanied by the same accomplice present during the bank robbery, assaulted and robbed her just two weeks after the bank robbery.   *Id.* at 344-45.   The defendant objected, arguing it was fundamentally unfair to allow this testimony because he had already been acquitted for this assault and robbery.   *Id.* at 344, 352-54.   The Supreme Court disagreed, finding that while the evidence had the potential to prejudice the jury, it "was at least circumstantially valuable in proving [the defendant's] guilt" in the bank

robbery and was, therefore, properly admitted. *Id.* at 353.

The similarity between the Madison Street Deli shooting and the Junior Food Store shooting was contested, as was the State's contention that the same person committed the crimes at both locations.   (Docs. 17-7 at 252-61; 17-8 at 5-7).   A co-defendant testified that Cromartie walked in the Junior Food Store, shot the clerk, and unsuccessfully tried to open the cash register.   (Doc. 18-15 at 140-41).   The twenty-minute video showed the shooter at the Madison Street Deli did the same thing: walked in the store, shot the clerk, and unsuccessfully tried to open the cash register. *Cromartie*, 270 Ga. at 781, 514 S.E.2d at 209.   While Cromartie could not be identified on the video, it was "at least circumstantially valuable in proving [his] guilt" because it showed the similarity between the two crimes. *Dowling*, 493 U.S. at 353.

Cromartie alleges that the Georgia Supreme Court's decision upholding the denial of trial counsel's request to play the entire two-hour video was contrary to *Washington v. Texas*, 388 U.S. 14 (1967), *Crane v. Kentucky*, 476 U.S. 683 (1986), and *United States v. Scheffer*, 523 U.S. 303 (1998).   (Doc. 69 at 101).   His only argument to support this allegation is that the Georgia Supreme Court "failed to identify or even cite" these cases. (Doc. 69 at 101).   The fact that the Georgia Supreme Court did not cite these cases does not make its decision contrary to them. *See Clark*, 821 F.3d at 1282.   A state court decision is contrary to Supreme Court precedent only when (1) faced with materially indistinguishable facts from a Supreme Court case, the state court arrives at a result different from that reached by the Supreme Court; or (2) the state court applies a rule that contradicts the law set forth in a Supreme Court case. *Bottoson v. Moore*, 234 F.3d 526, 531 (11th Cir. 2000) (citation omitted).   The Georgia Supreme Court did neither in this

case.[32]   Thus, its decision was not contrary to clearly established federal law.

This Court's review of a state court's decision regarding the admissibility of

evidence is extremely proscribed.   The Eleventh Circuit has explained that:

> In reviewing the evidentiary determination of a state trial judge, we
> are mindful of the fact that we do not sit as a super state supreme
> court.   Unlike a state appellate court, we are not free to grant the
> petitioner relief simply because we believe the trial judge has erred.
> The scope of our review is severely restricted.   Indeed, the general
> rule is that a federal court will not review a trial court's actions with
> respect to the admission of evidence.   A state evidentiary violation
> in and of itself does not support habeas corpus relief.   Before such
> relief may be granted, the violation must rise to the level of a denial of
> fundamental fairness

*Shaw v. Boney*, 695 F.2d 528, 530 (11th Cir. 1983) (quotation marks and citations

omitted).   Given this limited scope of review, the Georgia Supreme Court's rulings

regarding the Madison Street Deli video are reasonable, both factually and legally.

Even if this Court found an evidentiary error occurred, which it does not, habeas

relief is "warranted only when the error 'so infused the trial with unfairness as to deny due

process of law.'"   *Taylor v. Sec'y, Fla. Dep't of Corr.*, 760 F.3d 1284, 1295 (11th Cir.

2014) (quoting *Lisenba v. California*, 314 U.S. 219, 228 (1941)).   "In the context of state

evidentiary rulings, the established standard of fundamental fairness is that habeas relief

will be granted only if the state trial error was material in the sense of a crucial, critical,

highly significant factor."   *Shaw*, 695 F.2d at 530 (citations and quotations marks

---

[32] The facts of these three cases have nothing in common with Cromartie's case.   In *Washington*, the Court struck down a Texas statute which provided that principals, accomplices, or accessories in the same crime could not be introduced as witnesses for each other.   388 U.S. at 16-17.   The Supreme Court found the state law violated a defendant's Sixth and Fourteenth Amendment right to have compulsory process for obtaining witnesses.   *Id.* at 19, 23.   In *Crane*, the sixteen-year-old defendant was prohibited from introducing testimony describing the length and manner of his interrogation to show his confession was unworthy of belief.   476 U.S. at 686.   The Court held that the exclusion of testimony about the circumstances of his confession deprived the defendant of a fair opportunity to present a defense.   *Id.* at 691.   In *Scheffer*, the Court upheld Military Rule of Evidence 707, which makes polygraph evidence inadmissible in court-martial proceedings.   523 U.S. at 317.

omitted).   Cromartie has not made such a showing.   The Court, therefore, denies relief

on these claims.

## G.    CLAIM EIGHT: SHOE PRINT COMPARISON EVIDENCE

Cromartie alleges that his Fifth, Sixth, Eighth, and Fourteenth Amendment rights

were violated by the admission of shoe print comparison evidence.   Over trial counsel's

objection, Dr. James Howard, a micro-analyst and criminalist with the Georgia Bureau of

Investigation, testified as an expert in shoe print identification.   (Doc. 18-16 at 13-15).

Howard compared two plaster casts of footprints (one right foot and one left foot) from the

field adjacent to the Junior Food Store to Cromartie's, Thaddeus Lucas's, Corey Clark's,

and Gary Young's shoes.   (Doc. 18-16 at 23-31).   Howard testified that the plaster casts

were similar only to Cromartie's shoes.   (Doc. 18-16 at 32).

On direct appeal, the Georgia Supreme Court held:

> Cromartie contends that the trial court erred in denying his motion to
> suppress plaster cast shoe print evidence, claiming that the comparison of
> shoes with plaster casts of shoe prints cannot be verified with sufficient
> scientific certainty to make it admissible in court under the standards set
> forth in *Harper v. State*, 249 Ga. 519, 523-526 (1), 292 S.E.2d 389 (1982).
> In *Belton v. State*, 270 Ga. 671, 512 S.E.2d 614 (1999), we held with regard
> to this very issue that the standards for admissibility relating to scientific
> principles or techniques set forth in *Harper* are not applicable to shoe print
> identification because "the comparison of shoe prints to external physical
> characteristics of particular shoes is not a matter of scientific principle or
> technique."   Moreover, we note that shoe print comparison evidence has
> been widely admitted for many years in the courts of this State.
> Accordingly, this enumeration lacks merit.

*Cromartie*, 270 Ga. at 787, 514 S.E.2d at 213 (citations omitted).

Cromartie argues that the Georgia Supreme Court "failed to cite or apply relevant

U.S. Supreme Court precedent" and "[i]ts decision was thus 'contrary to' clearly

established federal law."   (Doc. 69 at 104) (citation omitted).   This is simply incorrect.

"A state court's decision is not 'contrary to . . . clearly established Federal law' simply because the court did not cite [the Supreme Court's] opinions."   *Esparza*, 540 U.S. at 16 (citation omitted). Cromartie also faults the Georgia Supreme Court for failing to "conduct any meaningful analysis of the reliability of the testimony."   (Doc. 69 at 104).   As explained above, the state courts are not required to conduct any analysis at all. Allegations that a state court "failed to say enough" and should have "provided a detailed explanation" cannot prevail.   *See Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1329 (11th Cir. 2012) (finding that requiring the state courts to provide detail "smacks of a 'grading papers' approach that is outmoded in the post-AEDPA era") (quoting *Wright v. Moore*, 278 F.3d 1245, 1255 (11th Cir. 2002)).

Cromartie argues that the Georgia Supreme Court's decision involved an unreasonable application of *Dowling* or *Lisenba*.[33]   It did not.   While factually dissimilar to Cromartie's case, *Dowling* and *Lisenba* both stand for the broad proposition that States are free to adopt their own rules of evidence and procedure as long as the application (or misapplication) of such does not render a defendant's trial fundamentally unfair. *Dowling*, 493 U.S. at 352-53; *see also Lisenba*, 314 U.S. at 228.   This Court cannot find the trial court's admission of shoe print testimony rendered Cromartie's trial fundamentally unfair.

As Respondent points out, expert testimony that Cromartie's shoe was similar to a shoe found near Junior Food Store was not the "linchpin" of the State's case against

---

[33] *Dowling* is discussed above.   In *Lisenba*, the Court addressed, *inter alia*, the admission into evidence of two rattlesnakes and the defendant's allegedly coerced confession.   314 U.S. at 228-29.   As for the snakes, the Court found they did not "so infuse[] the trial with unfairness as to deny due process of law."   *Id.* at 228.   As for the confession, the Court condemned the arresting officers for violating "state statutes" and committing "criminal offenses" in order to obtain the defendant's statement, but ultimately determined its admission into evidence was not so "fundamentally unfair" as to result in a denial of due process.   *Id.* at 234-40.

Cromartie.   (Doc. 75 at 197).   Instead, the State presented eye witness testimony, fingerprint evidence, ballistics evidence, and Cromartie's confession to other people. *Cromartie*, 270 Ga. at 781-82, 88, 514 S.E.2d at 209-10, 214.   Given this, the Court cannot find that the admission of the shoe print evidence rendered his trial fundamentally unfair.   *See Taylor*, 760 F.3d at 1297.   The Georgia Supreme Court's denial of this claim was not contrary to, and did not involve an unreasonable application of, Supreme Court precedent.[34]

## H.   CLAIM NINE: GUILT-PHASE INSTRUCTIONS

Cromartie argues the trial court made three errors in its guilt-phase instructions: (1) it failed to give a charge on felony murder (Doc. 69 at 105); (2) its instruction on witness credibility "effectively lower[ed] the prosecution's burden of proof" and "curtailed the jury's right to disbelieve even uncontradicted testimony" (Doc. 69 at 107); and (3) its instruction on reasonable doubt "effectively lower[ed] the prosecution's burden of proof" (Doc. 69 at 107), and "suggested to the jury that it could acquit only if it reached a level of uncertainty as to guilt far beyond what is required by the reasonable-doubt standard."   (Doc. 69 at 108).

### 1.   <u>Felony Murder</u>

Cromartie was indicted for aggravated assault, possession of a firearm during the commission of a crime, aggravated battery, malice murder, and armed robbery.   (Doc. 17-1 at 29-34).   The malice murder count alleged Cromartie did "unlawfully, knowingly,

---

[34] In his reply brief, Cromartie states, "Respondent also fails to develop any argument for why the admission of the shoe-print testimony did not violate Mr. Cromartie's Eighth Amendment rights."   (Doc. 78 at 52).   Cromartie, not Respondent, bears the burden here.   Cromartie has done nothing more than make the conclusory allegation that the admission of shoe-print testimony violated his right to a reliable sentencing determination under the Eighth Amendment.   He has not pointed to clearly established Supreme Court precedent, or any precedent for that matter, that holds such evidence is so unreliable its admission renders the sentencing phase of a defendant's trial unfair under the Eighth Amendment.

willfully and intentionally with malice aforethought cause the death of Richard A. Slysz, a human being by shooting said victim in the head."   (Doc. 17-1 at 30).   Cromartie was not indicted for felony murder.[35]   (Doc. 18-17 at 183).   The death penalty can be imposed for either felony murder or malice murder.   (Doc. 18-15 at 149, 184).

Trial counsel requested that the jury be charged: "If you find the defendant guilty of the lesser crime of [f]elony [m]urder, then your verdict should be so stated."   (Doc. 17-7 at 186).   The State objected, arguing that Cromartie had not been indicted for felony murder and felony murder is not a lesser included offense of malice murder.   (Doc. 18-17 at 183-87).   The Court agreed with the State and declined to give trial counsel's requested felony murder charge.   (Doc. 18-17 at 187).

On appeal, the Georgia Supreme Court found that

Cromartie's challenge to the failure of the trial court to charge the jury on felony murder as a lesser-included offense of malice murder, where Cromartie was not indicted for felony murder, is controlled adversely to him by *Henry v. State*, 265 Ga. 732(6), 462 S.E.2d 737 (1995).   In *Henry* we held that although the defendant was indicted for armed robbery and kidnapping with bodily injury along with malice murder, since reference was not made to these separate counts in the malice murder count, no charge on felony murder was required.   We concluded that because the evidence in the case independently established the offense of malice murder, without the evidence necessary to prove the armed robbery or the kidnapping, felony murder was not, as a matter of fact, a lesser included offense of malice murder mandating a separate felony murder charge.   As in *Henry*, Cromartie was indicted solely for malice murder, not felony murder.   In separate counts, Cromartie was also indicted for armed robbery and possession of a firearm during the commission of a crime . . . .   Because the malice murder count did not allege that the murder was committed while engaged in an armed robbery and "because the offense of felony murder would have required the proof of at least one additional fact beyond that required to establish malice murder," it was not error for the trial court to refuse to charge on felony murder.   As we have noted in Division 1, the

---

[35] Under Georgia law, "[f]elony murder requires proof that the defendant caused the death of another human being while in the commission of a felony."   *Henry v. State*, 265 Ga. 732, 737, 462 S.E.2d 737, 744 (1995) (citing O.C.G.A. § 16-5-1(c)).   "Malice murder requires proof that the defendant caused the death of another human being with malice aforethought."   *Id.* (citing O.C.G.A. § 16-5-1(a)).

evidence that Cromartie's finger and shoe prints were found at the murder scene, that Cromartie had borrowed the murder weapon before the crime, that the murder victim was shot twice in the head at close range, and that Cromartie had boasted about shooting Slysz was sufficient to establish malice murder independent of evidence necessary to establish any other charged felony.

Furthermore, assuming arguendo that felony murder was a lesser-included offense of malice murder in this case, we conclude that Cromartie can show no harm resulting from this ruling. Considering the evidence adduced, a felony murder conviction of Cromartie would not preclude the imposition of the death penalty.

*Cromartie*, 270 Ga. at 787-88, 514 S.E.2d at 213-14 (citations and footnotes omitted).   .

Cromartie argues that the Georgia Supreme Court's failure to cite *Beck v. Alabama*, 447 U.S. 625 (1980), rendered its opinion "contrary to clearly established federal law."   (Doc. 69 at 108).   It did not.   *Esparza*, 540 U.S. at 16.   He also argues that "to the extent the court can be viewed to have applied *Beck*, its application was objectively unreasonable and thus constituted an unreasonable application of that precedent."   (Doc. 69 at 108).   It was not.   In *Beck*, the Supreme Court held "a sentence of death [may not] constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, . . . when the evidence would have supported such a verdict[.]"   447 U.S. at 627.   In Georgia, felony murder is not a "lesser-included" offense to malice murder, and felony murder is not a "non-capital" offense.   *Cromartie*, 270 Ga. at 787-88, 514 S.E.2d at 213-14.   *Beck* does not require a state court "to instruct juries on offenses that are not lesser included offenses of the charged crime under state law." *Hopkins v. Reeves*, 524 U.S. 88, 90 (1998).   Also, even if felony murder was a lesser-included offense of malice murder, it is still a capital offense and, if found guilty of such, Cromartie would still have been eligible for the death penalty.   The Georgia

Supreme Court's decision on this issue did not, therefore, involve an unreasonable application of *Beck*.

2.   <u>Reasonable Doubt</u>

The government has the burden of proving each element of a charged offense beyond a reasonable doubt.   *In re Winship*, 397 U.S. 358, 361 (1970).   Cromartie argues that the trial court's instruction that jurors "should find reasonable doubt only if their minds were 'wavering, unsettled, unsatisfied'" effectively lowered the prosecution's burden of proof.   (Doc. 69 at 107) (quoting Doc. 18-19 at 9).   He states this language "suggested to the jury that it could acquit only if it reached a level of uncertainty as to guilt far beyond what is required by the reasonable-doubt standard."   (Doc. 69 at 108).

The trial court's entire reasonable doubt charge was as follows:

Now, ladies and gentlemen, this Defendant is to be presumed innocent until proven guilty.   A Defendant enters upon the trial of the case with a presumption of innocence in his favor and this presumption remains with the Defendant until it is overcome by the State with evidence which is sufficient to convince you beyond a reasonable doubt that the Defendant is guilty of the offense charged.

Now, no person shall be convicted of any crime unless and until each element of the crime charged is proven to the satisfaction of the jury beyond a reasonable doubt.

Now, the burden of proof rests upon the State to prove every material allegation of the indictment and every essential element of each crime charged beyond a reasonable doubt.   There is no burden of proof upon the Defendant whatever, and the burden never shifts to the Defendant to prove his innocence.   However, the State is not required to prove the guilt of the accused beyond all doubt.

And a reasonable doubt means just what it says.   It's a doubt of a fair-minded, impartial juror honestly seeking the truth.   It's a doubt based upon common sense and reason.   It does not mean a vague or an arbitrary doubt, but is a doubt for which a reason can be given arising from the evidence, a lack of evidence, a conflict in the evidence, or any combination of these.

> Now, ladies and gentlemen, if after giving consideration to all the facts and circumstances of the case your minds are wavering, unsettled, unsatisfied, then that is a doubt of the law and you should find the Defendant not guilty. But, if that doubt does not exist in your minds as to the guilt of the Defendant, then you would be authorized to find the Defendant guilty.   If the State fails to prove the Defendant's guilt beyond a reasonable doubt, then it would be your duty to find the Defendant not guilty.

(Doc. 18-19 at 8-9).

On appeal, the Supreme Court held that "[t]he trial court's charge on the definition of reasonable doubt, which has been previously approved by this [c]ourt, did not erroneously diminish the State's burden of proof."   *Cromartie*, 270 Ga. at 788, 514 S.E.2d at 214 (citations omitted).   Cromartie argues this decision involved an unreasonable application of *Cage v. Louisiana*, 498 U.S. 39 (1990), *overruled on other grounds by Estelle v. McGuire*, 502 U.S. 62, 72 n.4 (1991).

In *Cage*, the trial court instructed the jury that "reasonable doubt"

> *must be such doubt as would give rise to a grave uncertainty*, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof.   A reasonable doubt is not a mere possible doubt.   *It is an actual substantial doubt.*   It is a doubt that a reasonable man can seriously entertain.   What is required is not an absolute or mathematical certainty, but a *moral certainty*.

*Id*. at 40.   The Supreme Court held that "the words 'substantial' and 'grave,' as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable-doubt standard."   *Id*. at 41.   When read along with the phrase "'moral certainty,'" "a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause."   *Id*.

The Court fails to see the similarity between the words in *Cage*—"substantial" and "grave" and the trial court's words—"wavering, unsettled, [and] unsatisfied"—in Cromartie's case   Additionally, *Cage* "is limited precedent," *Johnson v. Alabama*, 256 F.3d 1156, 1192 (11th Cir. 2001), that has been both clarified and modified by later decisions.   *Felker v. Turpin*, 83 F.3d 1303, 1308 (11th Cir. 1994).   In the consolidated companion cases of *Victor v. Nebraska* and *Sandoval v. California*, the Court held that

> the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course.   Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof.   Rather, "taken as a whole, the instructions [must] correctly convey the concept of reasonable doubt to the jury."

511 U.S. 1, 5 (1994) (citations omitted).   Also, the constitutional inquiry under *Cage* was whether a reasonable juror "could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause."   498 U.S. at 41.   In subsequent cases, the Court clarified that "the proper inquiry is not whether the instruction 'could have' been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury *did* so apply it.   *Victor*, 511 U.S. at 6 (citing *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)).

The Eleventh Circuit has upheld a jury instruction that contained the same "wavering, unsettled and unsatisfied" language used by Cromartie's trial court.   *Felker*, 83 F.3d 1309 n.5.   The instruction emphasized Cromartie's presumed innocence, the State's necessity to prove every element beyond a reasonable doubt, and "grounded the definition of reasonable doubt in the evidence."   *Id.* at 1309.   Looking at the trial court's reasonable doubt instruction as a whole, this Court cannot find "a reasonable likelihood

that the jury understood the instructions to allow conviction based on proof" lower than

that required by the Due Process Clause.   *Victor*, 511 U.S. at 6.   Certainly, applying

AEDPA deference, the Court cannot find the Georgia Supreme Court's denial of relief

was contrary to, or involved an unreasonable application of, clearly established federal

law.

      3.    <u>Witness Credibility</u>

      Cromartie complains that the trial judge instructed the jury as follows regarding

witness credibility: "Now, when you consider the evidence in this case, if you find a conflict

in the evidence you should settle this conflict, if you can, without believing that any

witness has made a false statement."   (Doc. 69 at 106) (quoting Doc. 18-19 at 10).   He

argues this instruction "curtailed the jury's right to disbelieve even uncontradicted

testimony."   (Doc. 69 at 107).

      Had this been the trial court's complete charge on witness credibility, perhaps

Cromartie would be correct.   But, this one sentence was not the full charge.   *Francis v.*

*Franklin*, 471 U.S. 307, 315 (1985) (stating that any "potentially offending words must be

considered the in context of the charge as a whole").   The trial court's complete charge

on witness credibility was:

> Now, ladies and gentlemen, you must determine the credibility or
> believability of the witnesses who have appeared before you and testified in
> this case.   It's for you to determine what witness or witnesses you will
> believe and what witness or witnesses you will not believe if there are any
> that you do not believe.
>
> Now, in deciding or passing upon their credibility, you may consider all of
> the facts and circumstances of this case, the witnesses' manner of
> testifying, their intelligence, their interest or lack of interest in the case, their
> means and opportunity for knowing the facts to which they testify, the nature
> of the facts to which they testify, the probability or improbability of their
> testimony and of the occurrences about which they testify.   And you may

also consider their personal credibility insofar as that may legitimately
appear from the trial of this case.

Now, when you consider the evidence in this case, if you find a conflict in
the evidence you should settle this conflict, if you can, without believing that
any witness made a false statement.   However, if you cannot do this, then
it is your duty to believe that witness or those witnesses you think best
entitled to belief.   You must determine what testimony you will believe and
what testimony you will not believe in this case.

(Doc. 18-19 at 9-10).

On direct appeal, the Georgia Supreme Court found that "[t]he trial court's charge
on determining the credibility of witnesses was not error."   *Cromartie*, 270 Ga. at 788,
514 S.E.2d at 214.   Contrary to Cromartie's arguments, the state court's failure to cite
Supreme Court precedent did not "render[] [the] decision contrary to clearly established
federal law."   (Doc. 69 at 108); *Esparza*, 540 U.S. at 16.   Cromartie states in conclusory
fashion that the decision amounted to an unreasonable application of clearly established
federal law.   But, he fails to show how.   The Court's review of the clearly established
federal law regarding jury charges shows the state court's denial of relief did not involve
an unreasonable application of any Supreme Court precedent.[36]

I.   **CLAIM TEN: TRIAL COUNSEL'S LACK OF INVESTIGATION AND
PRESENATION OF MITIGATING EVIDENCE DURING THE PENALTY PHASE
OF TRIAL**

Cromartie first raised his claim that trial counsel were ineffective in their

investigation and presentation of mitigating evidence ("Claim Ten") in his amended

habeas petition filed on June 22, 2015.   (Doc. 62 at 55-66).   At that time, Cromartie was

---

[36] Without explanation, Cromartie argues the decision involved an unreasonable application of three
Supreme Court cases: *Cage, Mullaney v. Wilbur*, 421 U.S. 684 (1975), and *In re Winship*, 397 U.S. 358
(1970).   (Doc. 69 at 108).   These cases all stand for the proposition that the State bears of burden of
proving beyond a reasonable doubt every element of a charged offense.   *Cage*, 498 U.S. at 40-41;
*Mullaney*, 421 U.S. at 703-04; *In re Winship*, 397 U.S. at 361-62.   Cromartie has not shown how the
Georgia Supreme Court's decision upholding the trial court's credibility instruction constituted an objectively
unreasonable application of any of these cases.

385 days beyond AEDPA's one-year statute of limitations.   *See* 28 U.S.C. §

2244(d)(1)(A).   On March 21, 2016, Respondent sought leave to amend his answer to

allege that Claim Ten was time-barred.   (Doc. 74).   Cromartie was given the opportunity

to brief the merits of Respondent's time-bar defense.   (Doc. 77 at 2).   Cromartie argued

Respondent's motion should be denied because: (1) it was futile; (2) Respondent unduly

delayed filing the motion; and (3) the totality of the circumstances counseled against

allowing the amendment.   (Doc. 78 at 11-12 and n.4, 27-28).   Cromartie also argued

that if the Court found Claim Ten untimely, he was entitled to equitable tolling pursuant to

*Martinez v. Ryan*, 566 U.S. 1 (2012) and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013).

(Doc. 78 at 9-36).

In its August 22, 2016 Order, the Court granted Respondent's motion to amend.

(Doc. 80).   The Court found that the motion to amend was not futile, as Claim Ten did not

relate back to Cromartie's original petition and was accordingly untimely; Respondent did

not unduly delay filing the motion to amend; and the totality of the circumstances were in

favor of granting the motion to amend.   (Doc. 80 at 4-17).   The Court also found that

Cromartie was not entitled to equitable tolling under *Martinez* and *Trevino*.   (Doc. 80 at

17-18).

Based on reasoning fully explained in the August 22, 2016 Order, Claim Ten is

time-barred.   (Doc. 80 at 4-18).[37]   The Court, therefore, does not consider the merits of

this claim.   Having found Claim Ten time-barred, the Court **DENIES** as unnecessary

---

[37]  The Court notes that Cromartie has not argued that the time-bar can be overcome by a showing of
"actual innocence" under *McQuiggin v. Perkins*, 133 S. Ct. 1924 (2013).   When addressing his *Brady*
claim, however, Cromartie did argue he could overcome the procedural default by showing he is "innocen[t]
of the death penalty."   (Doc. 69 at 77).   The Court finds that Cromartie has not shown that "in light of . . .
new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt,"
*McQuiggin*, 133 S. Ct. at 1928 (quotation marks and citations omitted).   Nor has he shown that "he is
'innocent' of the death penalty because none of the aggravating factors legally necessary for invocation of
the death penalty applied."   *Sibley v. Culliver*, 377 F.3d 1196, 1205 (11th Cir. 2004).

Cromartie's and Respondent's requests for discovery of mitigation material and requests for an evidentiary hearing related to the merits of Claim Ten (Docs. 69 at 134, 178-80; 75 at 227-30; 78 at 56-57).

## J.    CLAIM ELEVEN: ARBITRARY IMPOSITION OF O.C.G.A. § 17-10-30(B)(7)

The jury sentenced Cromartie to death after finding the existence of three statutory aggravating circumstances: (1) "The offense of [m]urder was committed while the Defendant was engaged in the commission of . . . [a]rmed [r]obbery;" (2) "[t]he Defendant committed the offense of [m]urder . . . for the purpose of receiving money or any other thing of monetary value;" and (3) "the offense of [m]urder was outrageously or wantonly vile, horrible or inhumane in that it involved depravity of mind or it involved an [a]ggravated [b]attery to the victim prior to the death of the victim."   (Doc. 18-19 at 209). Cromartie argues that his death sentence was imposed arbitrarily and capriciously in violation of the Eighth and Fourteenth Amendments because there was no evidence to support the finding of the third statutory aggravating circumstance.   (Doc. 69 at 153-54)

Before the trial court charged the jury, trial counsel moved for a directed verdict regarding the O.C.G.A. § 17-10-30(b)(7) aggravating circumstance ("the (b)(7) aggravator"), arguing the State had presented no evidence of torture, depravity of mind, or an aggravated battery.   (Doc. 18-19 at 64-66).   The trial court decided it would charge the jury on the (b)(7) aggravator, but would not include the language regarding torture.[38] (Doc. 18-19 at 157-58, 182-83).   Cromartie raised this issue on direct appeal and the Georgia Supreme Court summarily denied it: "Cromartie's remaining contentions

---

[38] O.C.G.A. § 17-10-30(b)(7) reads: "The offense of murder, rape, armed robbery, or kidnapping was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim."   The trial court charged the jury that they would need to determine if the murder was "outrageously or wantonly vile, horrible or inhumane in that it involved depravity of mind or an [a]ggravated [b]attery to the victim . . . prior to the death of the victim…."   (Doc. 18-19 at 181-82).

regarding the sentencing phase jury charge are also without merit."   *Cromartie*, 270 Ga. at 789, 514 S.E.2d at 215.

Cromartie argues this Court should address the claim *de novo* because the Georgia Supreme Court failed to "meaningfully address this claim" (Doc. 69 at 155); did not "address the claim individually" (Doc. 69 at 156); and failed to "identify the law that governs this claim" (Doc. 69 at 156).   These arguments are meritless.   It is beyond dispute that the deference mandated by § 2254(d) applies even when a state court summarily denies relief.   *Pinholster*, 563 U.S. at 187-88; *Richter*, 562 U.S. at 99.   And, as stated previously, there is no requirement that that "a state court . . . even be aware of [Supreme Court] precedents," much less cite them.   *Esparza*, 540 U.S. at 16.

Next, Cromartie argues that even if deference applies, the Georgia Supreme Court's denial of this claim was contrary to, or involved an unreasonable application of, *Godfrey v. Georgia*, 446 U.S. 420 (1980).   (Doc. 69 at 155-56).   Godfrey shot his wife "in the forehead and killed her instantly."   *Godfrey*, 446 U.S. at 425.   "He then fired the gun at his mother-in-law, striking her in the head and killing her instantly."   *Id*.   During closing arguments, the prosecutor acknowledged that the case "involved no allegation of 'torture' or of an 'aggravated battery.'"[39]   *Id*. at 426.   The judge charged the jury using "the statutory language of the § (b)(7) aggravating circumstance in its entirety."   *Id*.   The jury recommended death for both murder convictions, finding that the murders were "'outrageously or wantonly vile, horrible, and inhuman.'"   *Id*.   Setting aside the death sentence, the Supreme Court found that "[n]o claim was made, and nothing in the record before us suggests, that the petitioner committed an aggravated battery upon his wife or

---

[39] The trial judge's report prepared after completion of the trial showed that, beyond the actual murders, neither victim had been "'physically harmed or tortured.'"   *Godfrey*, 446 U.S. at 426.

mother-in-law or, in fact, caused either of them to suffer any physical injury preceding their deaths." *Id.* at 432.

Contrary to Cromartie's arguments, the facts in his case are not "materially indistinguishable from the facts in *Godfrey* as they relate to the (b)(7) aggravator." (Doc. 69 at 156). First, "interfamilial emotional upset" motivated Godfrey to kill his wife and mother-in-law while greed apparently motivated Cromartie to kill Slysz. *Drake v. Francis*, 727 F.2d 990, 1000 (11th Cir. 1984), *aff'd in part, rev'd in part, remanded in part sub nom. Drake v. Kemp*, 762 F.2d 1449, 1460 (11th Cir. 1985) (en banc). Second, there was no question that each of Godfrey's victims died instantaneously from one gunshot wound. *Godfrey*, 446 U.S. at 425. Testimony indicated Cromartie first shot Slysz below his right eye and then his left temple.[40] (Doc. 18-14 at 13-14). The medical examiner testified that the shot below his eye would have caused Slysz to lose consciousness more slowly than the second shot to his left temple. (Doc. 18-15 at 19). Either shot would have rendered Slysz unconscious, but not caused immediate death. (Doc. 18-15 at 19-20). These facts distinguish Cromartie's case from *Godfrey*. Thus, the Georgia Supreme Court's decision was not contrary to, and did not involve an unreasonable application of, *Godfrey*.

Even assuming improper application of the (b)(7) aggravator, Cromartie's death sentence is still valid. The jury found two additional statutory aggravating circumstances: The offense of murder was committed while Cromartie was engaged in the commission of an armed robbery and Cromartie committed the offense of murder for

---

[40] Cromartie correctly argues that the medical examiner testified he could not determine which shot occurred first. (Doc. 18-15 at 8, 19). Cromartie is incorrect, however, when he states that Respondent's argument about the sequence of bullets has no support in the record. (Doc. 78 at 59). In Young's statement, which was read to the jury, Young stated that Cromartie told him he shot the clerk in the eye, through the glasses and then "shot him again." (Doc. 18-14 at 13).

the purpose of receiving money or any other thing of monetary value.   (Doc. 18-19 at

209).   The invalidation of a statutory aggravating circumstance does not render a death

penalty invalid if another statutory aggravating circumstance remains.   *Zant v. Stephens*,

456 U.S. 410, 416-17 (1982) (certifying the following question to the Georgia Supreme

Court: "What are the premises of state law that support the conclusion that the death

sentence in this case is not impaired by the invalidity of one of the statutory aggravating

circumstances found by the jury?"); *Zant v. Stephens*, 250 Ga. 97, 100, 297 S.E.2d 1, 4

(1982) (answering the certified question and holding that each case must be looked at

individually, but when a jury separately considers and finds two statutory grounds

supporting the death penalty, the subsequent invalidation of one of the grounds will not

necessitate reversal of the jury's death penalty recommendation); *Terrell v. GDCP

Warden*, 744 F.3d 1255, 1265 (11th Cir. 2014) (ruling that because "the jury need only

find one statutory aggravating factor to justify the imposition of the death penalty, the

invalidation of [a second] factor would not have likely changed the outcome of [the

defendant's] sentence"); *Drake*, 727 F.2d at 1000 n.10 (ruling that even if the jury

arbitrarily considered the (b)(7) aggravator, the defendant's death sentence was still valid

because the jury had also found the defendant committed the murder while he was

engaged in the commission of another capital felony under O.C.G.A. § 17-10-30(b)(2)).

Cromartie acknowledges *Zant* (Doc. 78 at 61), and that, under O.C.G.A.

§ 17-10-31 "any single aggravator may itself be *sufficient* for a jury to recommend death."

(Doc. 69 at 154 n.23).   But, without citation to authority, Cromartie argues that "it is likely

that the jury's recommendation of death . . . would differ depending on the number of

statutory aggravating circumstances found."   (Doc. 69 at 154 n.23).   He also argues

that, if the (b)(7) aggravator fails, the Court must "'determine whether, because of the failure, the sentence was imposed under the influence of an arbitrary factor.'"   (Doc. 78 at 61) (quoting *Zant*, 250 Ga. at 100, 297 S.E.2d at 4).   Even assuming the invalidity of the (b)(7) aggravator, Cromartie was not prejudiced by "evidence . . . submitted in support of that statutory aggravating circumstance which was not otherwise admissible."   *Zant*, 250 Ga. at 100, 297 S.E.2d at 4.   Also, evidence established that Cromartie murdered Slysz while he was engaged in an armed robbery, and he murdered him to get money or another thing of monetary value—beer.   Therefore, even had the jury arbitrarily considered (b)(7), Cromartie's death sentence would be upheld on both of these points.

## K.   CLAIM TWELVE: JUROR'S RELIANCE ON THE BIBLE AND OTHER EXTERNAL SOURCES DURING PENALTY PHASE DELIBERATIONS

Cromartie argues that one of the jurors, Gladys Leaks, originally supported sentencing him to life imprisonment.   (Doc. 69 at 157).   She, however, changed her vote after consulting the dictionary and the Bible, specifically "a passage in the Bible that commands death for those who commit 'iniquity.'"   (Doc. 69 at 157).   He argues that Leaks's "exposure to this biblical passage and consultation of a dictionary—and her subsequent reliance on these external sources to sway her vote—violated [his] right to have his punishment determined solely on the evidence presented in open court."   (Doc. 69 at 157-58).

Trial counsel raised this issue during the motion for new trial and called several jurors, including Leaks, and their investigator, David Mack, to testify at the motion for new trial hearing.[41]   (Doc. 18-24).   Leaks testified there was no Bible in the jury room during

---

[41]  In addition to calling Mack and various jurors, trial counsel submitted several newspaper articles and affidavits from witnesses they did not call to testify.   (Doc. 18-24 at 104-21).   Trial counsel explained that the newspapers were not submitted "for any evidentiary value contained therein, but simply to perfect the

deliberations, but she personally reads the Bible in her home every day of her life.[42] (Doc. 18-24 at 13-14, 17).   She stated that she did not read the Bible for Cromartie's case (Doc. 18-24 at 13-14, 17-18, 30); she did not use the Bible as a "reference" in Cromartie's case (Doc. 18-24 at 17); her decision regarding Cromartie's sentence was not based on her reading of the Bible or her religious beliefs (Doc. 18-24 at 30); and she did not "change[] her verdict" based on anything in the Bible (Doc. 18-24 at 16-17, 20-22).

When trial counsel asked Leaks if she recalled telling investigator Mack that she changed her vote from life to death after reading Ezekiel 33:19 and Proverbs 17:26 she stated:

> A. No.
>
> .                                        . . . .
>
> A. That's a lie.   No. I did not tell him that.
>
> Q. You deny having made that statement?
>
> A. Um-hum.   And Mr. Mack also came back with an affidavit written stating those same things there that he asked me and asked me to sign it.   And I told him I wouldn't sign it because that wasn't the way it was.
>
>                                        . . . .
>
> Q. And so I'm perfectly clear.   You read those two scripture prior to making your vote on the sentence of death?
>
> A. No.
>
> Q. You did not read those two scriptures prior to making your sentence?
>
> A. My decision was already made and it was time for to leave . . . .

---

record with regard to what newspaper articles were published . . . [about] this particular matter."   (Doc. 18-24 at 78-79).   The trial court admitted the newspapers for this sole purpose and not to prove the truth of matters asserted therein.   (Doc. 18-24 at 78-79).   The State objected to the admission of affidavits from witnesses who were not called to testify on the grounds of hearsay and the State's inability to cross examine the witnesses.   (Doc. 18-24 at 79).   The trial court sustained the objection but let trial counsel submit the affidavits for the record.   (Doc. 18-24 at 79-83).

[42] At trial counsel's request the jury was not sequestered.   *Cromartie*, 270 Ga. at 789 n.3, 514 S.E.2d at 215 n.3.

Q. Do you recall discussing your reading of the Bible with any of the other jurors . . . ?

A. No.   Uh-uh.

(Doc. 18-24 at 16-17).   Leaks also denied looking up the word "malicious" in the dictionary.   (Doc. 18-24 at 25-26).

Trial counsel called Mack "as a facts witness as to the credibility of" Leaks, who had allegedly given inconsistent statements regarding her use of the Bible and dictionary. (Doc. 18-24 at 64, 66).   Mack testified that Leaks told him Ezekiel 33:19 and Proverbs 17:26 helped her reach the decision to sentence Cromartie to death.   (Doc. 18-24 at 71). According to Mack, Leaks told him that she changed her vote to death the day after she read Ezekiel and Proverbs.   (Doc. 18-24 at 73).   He also testified that Leaks told him she looked up the work "malice" in the dictionary during the penalty phase deliberations. (Doc 18-24 at 73).   Mack admitted Leaks refused to sign the affidavit he prepared that contained these statements.   (Doc. 18-24 at 76).   Mack said that Leaks did not indicate the affidavit was untrue.   (Doc. 18-24 at 76-77).   Instead, she indicated that she no longer wanted to be involved in the case.   (Doc. 18-24 at 76).

After the close of evidence, the trial court ruled:

Gentlemen, I think both the State and the Defense has . . . reviewed the law in the area of the issue . . . .   The Court has reviewed the law that it could find in regards to that particular issue.

Based upon testimony that witnesses in this hearing, those being jurors and Mr. Mack, I do find that the testimony of Ms. Leaks and the other jurors are more credible in regards to the conflicts in the testimony.

In recalling the instructions given to the jury by the Court during the trial, I, of course, have not been over those in the transcript, but I think we went over them so many times that we all are very familiar with what those were, cautionary instructions to the jury specifically.

I believe that the jury followed the Court's instructions.   If I recall, I did ask them as a part and parcel of those instructions not to take a Bible into the jury room with them.   I do not recall having asked them or instructed them that they could not – I don't recall addressing the issue of whether or not in their personal lives they could make, they could continue to practice their religion.   I don't recall, certainly don't recall prohibiting them from continuing to practice any religion.

I don't know that simply – I think in your closing Mr. Mears, you were referring to Ezekiel and/or Proverbs, et cetera, and, you know, if you look at the content of a particular passage, I don't know that we can say that, based on what that content says, that no one could find comfort or something – or that their purpose of reading is different.   We can all get different interpretations.   I'm sure, being married to a Presbyterian minister, you know that you can get comfort from all parts of it and different people find comfort in different ways in their religions.

I don't feel that based upon the evidence in this case that the jury's decision to impose a sentence of death in this case was based on any arbitrary factors.   I believe from the trial of this case, from the Court's poll of the jurors, both guilt and sentencing phases, that they based their decision, and the evidence testimony presented today, that they based their decision on the evidence presented during the trial and the law charged them by the [c]ourt during the trial.

. . . .

And as I've stated, I don't find from the evidence that the jury in this case based their decision by reference to anything in an improper basis.   I don't find that the decision was arbitrary and I do not find that it violated Mr. Cromartie's constitutional rights.

And the Motion for New Trial is overruled and denied.

(Doc. 18-24 at 98-100).

Cromartie raised the issue on direct appeal and the Georgia Supreme Court found:

Cromartie claims that a juror changed her vote to a death sentence after consulting the Bible and that she looked up the word "malice" in a dictionary. At the hearing on Cromartie's motion for new trial, the juror in question testified that she reads the Bible every day as a personal matter and denied that her Bible reading had anything to do with Cromartie's case or her sentencing decision.   She also denied looking up anything in a dictionary during her jury service.   She and the five other jurors who testified at the

hearing stated that no Bible or dictionary was brought into the jury room and that the Bible did not enter into their deliberations.   The only contradictory evidence came from a defense investigator who claimed that the juror in question had admitted to him that she read Bible passages and looked up "malice" in the dictionary.   We hold the trial court did not abuse its discretion in crediting the testimony of the jurors and in concluding that the jury based its sentencing decision solely on the evidence and the trial court's instructions.   Furthermore, a juror's personal use of the Bible or other religious book outside the jury room is not automatically prohibited.

*Cromartie*, 770 Ga. at 789, 514 S.E.2d at 215 (citations and footnotes omitted).

Cromartie argues that the Georgia Supreme Court's decision was contrary to, and involved an unreasonable application of, clearly established federal law,[43] "when [the court] concluded that 'a juror's personal use of a Bible or other religious book outside the jury room is not automatically prohibited.'"   (Doc. 69 at 161) (quoting *Cromartie*, 270 Ga. at 789, 514 S.E.2d at 215).   With this statement, the Georgia Supreme Court did not find, as Cromartie argues, that there was no constitutional violation simply because Leaks read the Bible "in the privacy of her own home, away from the jurors."   (Doc. 69 at 161).   To the contrary, the Court specifically found that although Leaks read her Bible on a daily basis, which is not "automatically prohibited," the Bible did not enter the jurors' deliberations and the jury based its decision solely on the evidence and the trial court's

---

[43] Cromartie claims three cases make up the clearly established federal law: *Remmer v. United States*, 347 U.S. 227 (1954), *Turner v. Louisiana*, 379 U.S. 466 (1965), and *Parker v. Gladden*, 385 U.S. 363 (1966). (Doc. 69 at 160).   In *Remmer*, an unnamed person communicated with the jury foreperson that he could profit by finding in favor of the defendant.   347 U.S. at 228.   The Court held that "any private communication, contact, or tampering, directly or indirectly, with a juror during a [criminal] trial about the matter pending before the jury is . . . deemed presumptively prejudicial" and "the burden rests heavily upon the Government to establish . . . that such contact with the juror was harmless to the defendant."   *Id.* at 229. No such contact occurred in Cromartie's case.   In *Turner*, two deputy sheriffs were both the principal prosecution witnesses and the persons in charge of the jurors during their sequestration.   379 U.S. at 467-69.   The Court held that the constant and close association between these key witnesses and the jury deprived the defendant of his right to a fair and impartial trial.   *Id.* at 473-74.   No such contact occurred in Cromartie's case.   In *Parker*, a bailiff told the jurors that the defendant was guilty and advised them that if there was anything wrong in finding him guilty, the Supreme Court would correct it.   385 U.S. at 363-64. The Supreme Court held the statements violated the defendant's Sixth Amendment right to trial by an impartial jury and the right to confront witnesses.   *Id.* at 364-65.   Again, no such contact occurred in Cromartie's case.

instructions.   *Cromartie*, 270 Ga. at 789, 514 S.E.2d at 215.   This is exactly what the clearly established federal law requires—that the jury base its decision on the law and the evidence.   *Turner*, 379 U.S. at 472-73 (finding that "'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel").   The Georgia Supreme Court's ruling, therefore, was not contrary to, and did not involve an unreasonable application of, clearly established federal law.

Cromartie argues the trial court's failure to credit Mack's testimony over Leaks's testimony was unreasonable because his testimony matched the information contained in a newspaper article.   (Doc. 69 at 162).   According to the newspaper article, an anonymous juror "said the juror holding out for a sentence of life without parole read a Bible scripture Tuesday night that changed her mind."   (Doc. 18-24 at 105).   The trial court refused to admit the article for the "truth of the matter asserted."   (Doc. 18-24 at 78-83).   The anonymous juror could not be cross-examined and, as Respondent points out, "the statement clearly contained speculation as to another person's thought processes."   (Doc. 75 at 240).   The Court cannot find that the state habeas court acted unreasonably when it believed Leaks's testimony over that of Mack.   Leaks unequivocally and repeatedly stated that, while she read the Bible every day, she did not change her verdict based on anything in the Bible, and she did not consult the dictionary. (Doc. 18-24 at 15-17, 20-30).   When trial counsel questioned her fellow jurors, they all testified that they did not discuss the Bible; they did not know if the Bible helped Leaks reach her decision; and they reached their sentencing decision based on the evidence and the trial court's instructions.   (Doc. 18-24 at 36-38, 41, 44, 53, 55-56, 60, 62-63).

Credibility determinations are for the state courts, not federal courts considering § 2254 petitions.   *Consalvo*, 664 F.3d at 845.   Cromartie has not presented the necessary clear and convincing evidence to overcome the presumption that the state court correctly determined Leaks to be credible.   *Id.*; *McNair v. Campbell*, 416 F.3d 1291, 1309 (11th Cir. 2005) (denying habeas relief because, *inter alia*, petitioner did not present clear and convincing evidence to overcome the state court's factual finding that readings from the Bible, which was brought to the jury room, and prayers, also in the jury room, did not encourage the jurors to base the verdict on anything other than the evidence presented in the trial of the case).   The Court, therefore, denies relief on this claim.

## L.   CLAIM THIRTEEN: DISPROPORTIONATE AND ARBITRARY DEATH SENTENCE

Cromartie argues that his death sentence for a murder conviction that involved a single killing of an adult "during a botched convenience-store robbery" violates his Eighth Amendment right to be free from cruel and unusual punishment.   (Doc. 69 at 163).   On direct appeal he argued that the death sentence was disproportionate in his case.   Citing twelve cases, the Georgia Supreme Court found that

> [t]he death sentence in this case was not imposed under the influence of passion, prejudice, or any other arbitrary factor.   The death sentence is also not disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. The similar cases listed in the Appendix support the imposition of the death penalty in this case, as all involve a deliberate killing during the commission of an armed robbery.

*Cromartie*, 270 Ga. at 789, 514 S.E.2d at 215 (citations omitted).   Cromartie raised the issue again during his state habeas proceedings and the court found his claim regarding the proportionality of his sentence was *res judicata*, and Cromartie's challenge to the Georgia Supreme Court's proportionality review was procedurally defaulted and,

alternatively, without merit.   (Doc. 23-37 at 9-10).

There is no constitutional right to proportionality review, and the Eleventh Circuit has instructed the district courts not to conduct proportionality reviews in death penalty habeas corpus cases.   In *Pulley v. Harris*, 465 U.S. 37 (1984), the Court held, "[t]here is . . . no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed."   *Id.* at 50.   In *Moore v. Balkcom*, 716 F.2d 1511 (11th Cir. 1983), the Eleventh Circuit held:

> A federal habeas court should not undertake a review of the state supreme court's proportionality review and, in effect, "get out the record" to see if the state court's findings of fact, their conclusion based on a review of similar cases, was supported by the "evidence" in the similar cases.   To do so would thrust the federal judiciary into the substantive policy making area of the state.   It is the state's responsibility to determine the procedure to be used, if any, in sentencing a criminal to death.

*Id.* at 1518 (citing *California v. Ramos*, 463 U.S. 992, 996-1001 (1983)).

Because the Constitution does not entitle Cromartie to proportionality review and the Eleventh Circuit has specifically instructed district courts not to review the proportionality review undertaken by the state supreme court, the Court must refuse Cromartie's request for such.

## M.   CLAIM FOURTEEN: UNCONSTITUTIONALITY OF THE DEATH PENALTY

Cromartie argues that the death penalty is incompatible with "'evolving standards of decency that mark the progress of a maturing society.'"   (Doc. 69 at 164) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).   He points out that some States are moving to abolish the death penalty while other States, which continue to employ the death penalty, are turning away from it as a matter of practice.   (Doc. 69 at 149-60).   He cites the dissent in *Glossip v. Gross*, in which Justice Breyer, joined by Justice Ginsburg, stated

that it is "highly likely that the death penalty violates the Eighth Amendment."   135 S. Ct. 2726, 2776-77 (2015) (Breyer, J., dissenting).   Cromartie argues that in the near future the Supreme Court might embrace the logic of Breyer's dissent and find the death penalty no longer comports with the Eighth Amendment.   (Doc. 69 at 175).

It might; or it might not.   At this time, however, the law "is settled that capital punishment is constitutional."   *Glossip*, 135 S. Ct. at 2732.   Unless, and until, that changes, this Court is bound by the Supreme Court's ruling that the death penalty does not violate the Constitution.[44]   *Id.*   The Court, therefore, denies relief on this claim.

## N.   CLAIM TWENTY-FOUR: CUMULATIVE ERROR

Cromartie argues that if the Court finds he is not entitled to relief based on any single claim because he has not shown the prejudicial effect of a single error, the Court should find he is entitled to relief because of the cumulative prejudicial effect of all of the errors.   (Doc. 69 at 177).   Respondent argues there is no Supreme Court or Eleventh Circuit precedent that calls for the Court to conduct a cumulative error analysis.   (Doc. 75 at 265).   Plus, to conduct such analysis would violate the rule of comity in § 2254 because Georgia has no cumulative error rule.   (Doc. 75 at 265).

---

[44] Cromartie acknowledges that he did not present this claim to the state courts and it is, therefore, unexhausted and procedurally defaulted.   (Docs. 69 at 176; 78 at 65).   He states that he can overcome the default by showing that the death penalty is unconstitutional and, therefore, no reasonable juror could possibly find him eligible for the death penalty.   (Doc. 69 at 176).   He requests a hearing because "full factual development of the questions of the death penalty's reliability, arbitrariness, delays, and decline in usage would entitle him to relief."   (Doc. 69 at 176).   Cromartie is correct that *Pinholster* does not bar an evidentiary hearing because this claim was not decided on the merits by the state court.   *Pinholster*, 563 U.S. at 181-82 (holding that where a claim has been "'adjudicated on the merits in the state court proceedings[,]'" the record is limited to the "record before the state court.") (quoting 28 U.S.C. § 2254(d)). But, Cromartie's argument regarding the constitutionality of the death penalty is clearly foreclosed by Supreme Court precedent.   An evidentiary hearing is, therefore, unnecessary.   *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (holding that an evidentiary hearing should be granted only if alleged facts would entitle petitioner to habeas relief).   Consequently, the Court **DENIES** Cromartie's request for an evidentiary hearing on Claim Fourteen.

Even if the Court should undertake a cumulative error analysis, Cromartie would not be entitled to relief.   "For our purposes, it is enough to say that [Cromartie's] cumulative error claim clearly fails in light of the absence of any individual errors to accumulate."   *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 n.3 (11th Cir. 2012); *see also Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014).

## IV.   CONCLUSION

For the reasons explained above, Cromartie's petition for writ of habeas corpus, his requests for discovery, and his requests for an evidentiary hearing are **DENIED**.

## CERTIFICATE OF APPEALABILITY

A prisoner seeking to appeal a district court's final order denying his petition for writ of habeas corpus has no absolute entitlement to appeal but must obtain a Certificate of Appealability ("COA").   28 U.S.C. § 2253(c)(1)(A).   As amended effective December 1, 2009, Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a [COA] when it enters a final order adverse to the applicant," and, if a COA is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."

The Court can issue a COA only if the petitioner "has made a substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2).   To merit a COA, the Court must determine "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"   *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citations omitted).   If a procedural ruling is involved,

the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."   *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).[45]

The Court finds the standard for the grant of a COA has not been met.

**SO ORDERED**, this 31st day March, of 2017.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT

---

[45] This Court determined that it could not reach the merits of Claim Ten, trial counsel's alleged failure to investigate and present mitigating evidence during the penalty phase of trial, because the claim was time barred.   (Doc. 80 at 4-17).   The Court also found that Cromartie was not entitled to equitable tolling under *Martinez* and *Trevino.*   (Doc. 80 at 17-18).   Cromartie's argument that *Martinez* and *Trevino* should be extended to the statute of limitations has been foreclosed by binding circuit precedent.   *Arthur v. Thomas*, 739 F.3d 611, 630 (11th Cir. 2014) ("At no point in *Martinez* or *Trevino* did the Supreme Court mention the 'statute of limitations,' AEDPA's limitations period, or tolling in any way" and, therefore, these cases do "not apply to AEDPA's statute of limitations or the tolling of that period.").   "If the petitioner's contention about the procedural ruling against him is foreclosed by a binding decision[,]" the Court should not issue a COA "because reasonable jurists will follow controlling law."   *Gordon v. Sec'y Dep't of Corr.*, 479 F.3d 1299, 1300 (11th Cir. 2007).   No reasonable jurist would find it debatable that Claim Ten is untimely and it is not debatable that *Martinez* and *Trevino* do not toll AEDPA's statute of limitations.   Therefore, while this Court often grants a COA when the issue is one of trial counsel's performance in the investigation and presentation of mitigating evidence, it declines to do so in this case.